Richard P. DZIUBAK, Respondent,

v.

J. Thomas MOTT and James T. Hankes, Petitioners, Appellants.

No. C7–91–2517.

Supreme Court of Minnesota.

Aug. 6, 1993.

Hubert H. Humphrey III, Atty. Gen., David T. Schultz, Sp. Asst. Atty. Gen., St. Paul, for appellants.

Richard W. Johnson, Red Wing, for respondent.

TOMLJANOVICH, Justice.

In 1962, the United States Supreme Court recognized the right to counsel as one of the safeguards necessary to insure fundamental human rights when it made obligatory upon the states by the Fourteenth Amendment the Sixth Amendment guarantees of the right to counsel. *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1962).

> [The assistance of counsel] is one of the safeguards of the Sixth Amendment deemed necessary to insure fundamental human rights of life and liberty * * *. The Sixth Amendment stands as a con-

stant admonition that if the constitutional safeguards it provides be lost, justice will not 'still be done.'

*Gideon*, 372 U.S. at 343, 83 S.Ct. at 796 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 462, 58 S.Ct. 1019, 1022, 82 L.Ed. 1461 (1938)).

\* \* \* \* \* \*

[R]eason and reflection require us to recognize that in our adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him.

*Gideon*, 335 U.S. at 344, 83 S.Ct. at 796.

The Minnesota Legislature responded in 1965 by adopting legislation to create a system of state and district public defenders. Act of May 26, 1965, ch. 869, §§ 1–20, 1965 Minn.Laws 1631–38 (codified as amended at Minn.Stat. §§ 611.14–611.21 (1992)).[1] In 1981 the legislature created the State Board of Public Defense. Act of June 1, 1981, ch. 356, § 360, 1981 Minn. Laws 1982–84 (codified as amended at Minn.Stat. § 611.215 (1992)).

Today we are asked to decide whether the state public defenders are immune from suit for malpractice. This appeal arises from respondent Richard P. Dziubak's complaint filed in Ramsey County district court against the petitioners, J. Thomas Mott and James T. Hankes, alleging ten counts of legal malpractice. Mott and Hankes were public defenders appointed to represent Dziubak against charges of second degree murder and first degree manslaughter in the death of Dziubak's mother.[2] Mott and Hankes moved for a dismissal based upon immunity from suit, or for summary judgment based upon collateral estoppel.

The trial court denied the motion to dismiss, but ruled Dziubak was collaterally estopped from litigating whether Mott and Hankes were negligent for failure to discover the fatal levels of anti-depressants in decedent's blood. The other allegations of negligence were reserved for trial. The court of appeals affirmed. *Dziubak v. Mott*, 486 N.W.2d 837 (Minn.App.1992).

The sole issue on appeal is whether public defenders are immune from suit for legal malpractice.

■ Because we find there are sound public policy reasons favoring immunity, we reverse and hold that public defenders are immune from suit for legal malpractice.

**I.**

The right to counsel in criminal prosecutions was a fully recognized right in at least twelve of the thirteen original colonies. *See Powell v. Alabama*, 287 U.S. 45, 64–65, 53 S.Ct. 55, 62, 77 L.Ed. 158 (1932). This right to assistance of counsel for a defense is guaranteed by the Sixth. Amendment. The *Powell* court found that in a capital case, "the necessity of counsel was so vital and imperative that the failure of the trial court to make an effective appointment of counsel was \* \* \* a denial of due process." *Id.* at 71, 53 S.Ct. at 65.

Denial to the poor of the request for counsel in proceedings based on charges of serious crime has long been regarded as shocking to the 'universal sense of justice' throughout this country. \* \* \* 'It is not to be thought of, in a civilized community, for a moment, that any citi-

1. In 1917 the legislature created a public defenders office in counties with a population of 300,000 or more people. Act of April 21, 1917, ch. 496, §§ 1–7, 1917 Minn.Laws 835–36 (codified as amended at Minn.Stat. § 611.12 (1988)). This was repealed by the Act of June 3, 1989, ch. 335, art. 3, § 57, subd. 2, 1989 Minn.Laws 2932.

2. Dziubak pleaded guilty to one count of second degree manslaughter and was sentenced to Stillwater prison. After serving 15 months of his sentence, Dziubak petitioned the district court, through privately retained counsel, to vacate his guilty plea. During investigation, it was discovered that Dziubak's defense expert had misread the toxicology report, which indicated fatal levels of anti-depressants in the decedent's blood. The court vacated the guilty plea based upon a finding that, through the fault of neither Dziubak, Mott, nor Hankes, exculpatory evidence existed which could have resulted in an acquittal. Respondent was then tried and acquitted of murder.

The merits of the underlying guilty plea and subsequent acquittal are not before us.

zen put in jeopardy of life or liberty, should be debarred of counsel because he was too poor to employ such aid. No Court could be respected, or respect itself, to sit and hear such a trial.'

*Betts v. Brady,* 316 U.S. 455, 476–77, 62 S.Ct. 1252, 1263, 86 L.Ed. 1595 (1942) (Black, J., dissenting) *overruled by Gideon v. Wainwright,* 372 U.S. 335, 339, 83 S.Ct. 792, 793–94, 9 L.Ed.2d 799 (1963).

The United States Supreme Court left the question of immunity to the states to decide when it declined to hold that federal law provides immunity for counsel in state malpractice suits. *Ferri v. Ackerman,* 444 U.S. 193, 100 S.Ct. 402, 62 L.Ed.2d 355 (1979). The Court noted that valid public policy reasons may justify such a grant of immunity. *Id.* at 204–05, 100 S.Ct. at 409.

In *Tower v. Glover,* the Supreme Court held that there is no immunity when a public defender deliberately conspires with a prosecutor to intentionally deprive defendants of their constitutional rights, and therefore, public defenders are subject to suit under 42 U.S.C. § 1983. *Tower v. Glover,* 467 U.S. 914, 104 S.Ct. 2820, 81 L.Ed.2d 758 (1984). The Court noted, however, that English barristers are a close "cousin" to public defenders, and, since at least 1435 A.D. have enjoyed broad immunity from liability for negligent, but not intentional misconduct. *Id.* at 921, 104 S.Ct. at 2825.[3]

■ Tort immunity, the freedom from suit or liability, is generally based on the idea that, though a defendant might be negligent, important social values require that the defendant remain free of liability. W. Page Keaton et al., *Prosser & Keaton on the Law of Torts,* § 131 at 1032 (5th ed. 1984).

## II.

Historically, we have extended immunities to participants within the judicial system. In the almost 30 years since the public defender statute was enacted, we have not been called upon to resolve the question whether public defenders have immunity.[4] Immunity in a judicial setting encourages independence; it is thought unlikely that officials will commit abuses since the appellate review process is likely to prevent serious torts. Keaton, *supra,* § 132 at 1059.

Judges were held to be immune from civil liability for the exercise of judicial authority in *Stewart v. Cooley,* 23 Minn. 347, 350 (1877). We based this decision on the principle that the free exercise of judicial functions, uninfluenced by fear of per-

---

**3.** Until 1836, English law did not provide the accused with any right to defense by counsel against summary convictions and charges of felony. In misdemeanor cases, and after 1695, in prosecutions for treason, the rule was that the defense must be conducted either by the defendant in person or by counsel, but both could not participate in the trial. *See, Betts v. Brady,* 316 U.S. 455, 466, 62 S.Ct. 1252, 1258, 86 L.Ed. 1595 (1942) (citations omitted).

**4.** Other jurisdictions have considered this question. Some have found no immunity. *See Spring v. Constantino,* 168 Conn. 563, 362 A.2d 871 (1975) (public defender is not a public official and actual conduct of defense is not a governmental act); *Reese v. Danforth,* 486 Pa. 479, 406 A.2d 735 (1979) (once the appointment of public defender is made, the state or public function ceases, and the attorney takes on all the obligations and protections of the private attorney-client relationship); *Donigan v. Finn,* 95 Mich.App. 28, 290 N.W.2d 80 (1980) (claim-

ing a strong indication of a trend away from immunity).

Other courts have extended immunity to public defenders. *See Browne v. Robb,* 583 A.2d 949 (Del.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1425, 113 L.Ed.2d 477 (1991) (state tort claims act grants general qualified immunity to private defense counsel appointed to represent indigent defendant in lieu of public defender); *Scott v. City of Niagra Falls,* 407 N.Y.S.2d 103, 95 Misc.2d 353 (Supp.1978) (role of the public defender, like that of the judge and district attorney, is to insure justice within the adversary system, and professional service was to both the assigned client and the public); *Ramirez v. Harris,* 105 Nev. 219, 773 P.2d 343 (1989) (statute conferring immunity for discretionary acts included public defender in its definition of "public officer.")

Numerous courts in the Third, Fourth, Fifth, Seventh and Ninth circuits have determined public defenders are immune in cases arising under 42 U.S.C. § 1983; however the Eighth Circuit has ruled otherwise. (The case before us does not involve a § 1983 claim.)

sonal consequences, is essential to the best interests of society. *Id.*

Next, we held that a board of directors was acting in a quasi-judicial function when it conducted an arbitration involving charges against a member. Consequently we held that the board was immune from civil liability. *Melady v. South St. Paul Live Stock Exchange,* 142 Minn. 194, 171 N.W. 806 (1919).

> The reasons justifying the rule [of immunity] have been frequently stated. * * * No man would willingly serve * * * if he might be sued for damages. * * * The protection afforded by the rule * * * should be extended to all to whom the law or the agreement of the parties, commits the exercise of authority of an essentially judicial nature.

*Id.* 142 Minn. at 197, 171 N.W. at 807.

We have also decided that court commissioners and court appointed examining physicians are quasi-judicial officers and immune from civil suit. *See, Linder v. Foster,* 209 Minn. 43, 295 N.W. 299 (1940).

Most recently, we held that a guardian ad litem is absolutely immune in a negligence claim for actions performed within the scope of her or his duties. *Tindell v. Rogosheske,* 428 N.W.2d 386 (Minn.1988).

> We think it is critical to view the role of the guardian in the context in which the responsibilities imposed upon the individual arise. A guardian ad litem is appointed by the court to protect the best interests of the child in the particular proceeding in which the child is involved. * * * We are convinced that, for the very reasons that the doctrine arose in the first instance, it must now be so extended.
>
> A guardian must be free, in furtherance of the goal for which the appointment was made, to engage in a vigorous and autonomous representation of the child. Immunity is necessary to avoid harassment from disgruntled parents who may take issue with any or all of the guardian's actions.

*Id.* at 387 (citations omitted).

■ The reasoning in *Tindell* is persuasive. Like a guardian ad litem, the public defender is appointed to protect the best interests of her or his client and must be free to exercise independent, discretionary judgment when representing the client without weighing every decision in terms of potential civil liability. *See Minns v. Paul,* 542 F.2d 899, 902 (4th Cir.1976) (public defender immunity in 42 U.S.C. § 1983 action).

We recognize that privately retained defense counsel must also exercise independent discretion in the defense of her or his clients, and are not immune from legal malpractice claims. However, there are significant differences between private counsel and public defenders which require the extension of immunity to public defenders.

■ First, a public defender may not reject a client, but is obligated to represent whomever is assigned to her or him, regardless of her or his current caseload or the degree of difficulty the case presents.

> [P]ublic defenders in Minnesota, with few exceptions, are working substantially above capacity with insufficient time to devote to their cases and their clients. Workload is too high in every district given the current level of staff. * * * And things are getting worse in this regard.

The Spangenberg Group, *Weighted Caseload Study for The State of Minnesota Board of Public Defense* at 20 (1991).

This is not the case with privately retained counsel, however. She or he may confer with a potential client, and, based upon such factors as the merits of the case, the personality of the client, or the amount of work they can adequately handle, determine whether to accept or decline representation of a potentially troublesome client.

Second, public defenders are limited in their representation by the resources available to their office. Public Defender offices are grossly under-funded. For example, in Ramsey County

[t]he caseload[s] * * * can only be described as 'out of bounds'.

\* \* \* \* \* \*

[t]here is a serious problem in the office with an insufficient budget for expert witness services

*Id.* at 29–30. To the contrary, private defenders are limited only by what the client is able to pay. The funds available to the client usually serve to prevent the presentation of frivolous claims, tactics or defenses. There is no similar "brake" in the public defender-client relationship since the state, rather than the client, pays the attorney.

[T]he client has no economic incentive for eschewing frivolous claims. The experience of the federal courts in federal habeas corpus and § 1983 litigation demonstrates that indigents more frequently attempt to litigate claims which are patently without merit than do non-indigent parties.

*Minns*, 542 F.2d at 902.

The office of the public defender does not have sufficient funds to represent each client assigned to it in the way each client might demand to be served. An increasing crime rate and an economic climate which has resulted in increased claims of indigency and lower state budgets to fund government positions have caused public defender caseloads to grow dramatically. *See* Spangenberg, *supra* at 5–6.

We believe that if the public defender is not immune from liability, the cost and burden of defending civil claims will only exacerbate this situation. In the end, this would hurt indigent defendants, not help them.

The indigent defendant who thinks the court-appointed attorney was negligent is not without remedies through the appeal process and motions for post-conviction relief and habeas corpus.

It would be an unfair burden to subject the public defender to possible malpractice for acts or omissions due to impossible caseloads and an under-funded office:

something completely out of the defender's control.

### III.

It is doubtful that an indigent client could prevail against a public defender in a negligence suit for failing to pursue a particular strategy, and if a negligence claim involves a dispute over a choice of strategies, it should fail, since honest errors may be made which do not raise to the level of malpractice. *Ouellette v. Subak*, 391 N.W.2d 810, 815 (Minn.1986). However, the cost in money and resources to defend against malpractice suits is at least as important, if not more important than the cost of any possible damage awards. Respondent argues that indemnification of public defenders by the state solves the immunity issue. We do not believe this is so.

■ Immunity exists to free government officials from the burdensome consequences of litigation. These consequences are not limited to liability for money damages; they also include the general costs of subjecting officials to the risk of trial—distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of abler people from public service. * * * [E]ven such pretrial matters as discovery are to be avoided if possible, as '[i]nquiries of this kind can be peculiarly disruptive of effective government.'

*Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 816–817, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982)).

■ Substantial time, energy and money are consumed in discovery: answering interrogatories, filing affidavits, and deposing witnesses. These resources consumed to defend against malpractice suits filed against public defenders would take away from the already limited resources available to serve the indigent constituency. In addition, the potential of civil liability for a lack of resources not within a defender's control would serve as a deterrent to re-

cruiting and maintaining dedicated professionals committed to providing an effective defense to indigent criminal defendants. For these reasons, we reject the argument that indemnity is sufficient protection for public defenders.

We find the reasoning of the Third Circuit persuasive:

> We perceive no valid reason to extend this immunity to state and federal prosecutors and judges and to withhold it from state-appointed and state-subsidized defenders. Implicit in the extension of judicial immunity to prosecutors was the recognition of a public policy encouraging free exercise of professional discretion in the discharge of pre-trial, trial, and post-trial obligations. * * *
>
> '[T]he most probable result of such a decision [to not grant immunity] would be the exact opposite of what the courts want. Both the Court and the Public Defender's Office [seek] adequate representation of defendants in criminal proceedings * * *. However, if a civil rights suit from unsatisfied clients is a constant threat to the Attorney involved, then there would be a chilling effect upon Defense Counsel's tactics. Defense Counsel would be caught in an intrinsic conflict of protecting himself and representing his client.'

*Brown v. Joseph,* 463 F.2d 1046, 1048–49 (3rd Cir.1972), *cert. denied,* 412 U.S. 950, 93 S.Ct. 3015, 37 L.Ed.2d 1003 (1973) (citation omitted) (emphasis added).

Immunity from suit for public defenders best serves the indigent population in preserving the resources of the defender's office for the defense of the criminally accused. Immunity also aids in the recruitment of qualified attorneys to represent indigent clients in criminal proceedings. Immunity preserves the criminal justice system which relies upon the judge, prosecutor and public defender as essential participants. This serves the best interests of indigent defendants and of society as a whole.

## IV.

■ We, like the United States Supreme Court, recognize the essential role performed by the defendant's attorney within our adversarial system of justice. This role is no less important when performed by counsel appointed to represent an indigent accused of a crime. If defense were available only to those of means, there would be no justice at all. Rather, an adequate defense must be available to all criminal defendants, and must be provided to those who do not have resources to obtain counsel by their own means.

> The judge, district attorney, and public defender are parts of a courtroom triumvirate. Each has a function which is essential to the working of the triumvirate. Each has a function which is essential to the working of the system. The public defender's role is that of an adversary to the prosecutor—not an adversary of the system but an integral part of it. * * * [S]ociety reaps the benefit from a smoother functioning criminal justice system.

Stephen L. Millich, *Public Defender Malpractice Liability in California,* 11 Whittier L.Rev. 535, 537–38 (1989).

Since justice demands that a defense be provided to criminal defendants who are not able to afford privately retained counsel, it is essential that a sufficient number of qualified attorneys be willing and able to provide this defense. Immunity will aid in the continued recruitment of attorneys to perform this service in our criminal justice system; such service is eagerly sought by most attorneys. The accused defendant is not the sole beneficiary. Society as a whole depends upon the role of defense counsel to secure an ordered system of liberty and justice, as ordained by our Constitution.

The extension of immunity to public defenders will ensure that the resources available to the public defender will be used for the defense of the accused, rather than diminished through the defense of public defenders against civil suits for malpractice. Immunity will conserve these resources to provide an effective defense to

the greatest number of indigent defendants.

Reversed.

GARDEBRING, Justice (dissenting).

By this opinion the majority denies to poor criminal defendants a civil remedy for the failure of their counsel to provide them an adequate defense. This action creates *de facto* just the kind of two-tier criminal justice system that the Supreme Court hoped to obliterate in its landmark decision, *Gideon v. Wainright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). I can find no justification for such a result and I respectfully dissent. I would hold that public defenders are not immune from suit for malpractice.

The majority opinion focuses on the differences between privately retained counsel and lawyers who practice as public defenders, noting particularly that public defenders may not reject a client, but are obligated to represent whomever is assigned to them. They are, in effect, part of a coerced relationship. Indeed! But the real disadvantage is, of course, to the indigent defendant, whom we have said has no right to choose his lawyer, *State v. Fagerstrom*, 286 Minn. 295, 299, 176 N.W.2d 261, 264 (1970), but must depend on whomever is assigned in matters that are of the most extreme gravity. If the public defender fails in the task of representation, he or she may be subject to an unfavorable performance appraisal; but the client may be unfairly convicted of a crime and sentenced to prison. The presence of remedies to overturn the conviction due to ineffectiveness of counsel cannot fully "right the wrong" done to someone who may have spent extended periods of time incarcerated unjustly. I believe that a civil remedy is needed.

Furthermore, the majority opinion seems to reflect a lack of confidence in the professional qualifications of the attorneys who serve as public defenders. I believe that public defenders are highly experienced professionals who provide the best possible defense based upon the financial limitations of their organizations. While the majority considers it an unfair burden to subject the public defender to malpractice stemming from acts or omissions due to impossible caseloads and an under-funded office, factors out of the control of the defender, it is even more unfair that the indigent client should suffer from misrepresentation due to under-funded offices. I do not believe this court should sanction the chronic underfunding of public defense organizations by lessening the obligations which public defenders have to their indigent clients.[1]

Furthermore, in the absence of immunity, I do not believe there would be an onslaught of malpractice suits filed against public defenders. First, public defenders are doing an admirable job under difficult circumstances and it is the rare case which would survive a motion to dismiss. Second, because of their indigence, defendants who have had public defenders will find it difficult to retain counsel to represent them in a malpractice suit against a public defender unless the circumstances are so outrageous as to be obvious malpractice.[2]

Finally, immunity is not necessary to preserve the ability to recruit and maintain dedicated professionals willing to serve as public defenders. There is no shortage of private attorneys willing to do criminal defense work without immunity. In addition, indemnity likely to be provided by the state for any malpractice awards removes any possible deterrence to recruitment and assures that public defenders will be devoted to their clients' cases with no fears of conflict of interest. *See* Stephen L. Millich,

---

1. As at least one law review notes, "a politican (sic), at best, has little to gain by advocating large expenditure for the defender office, and at worst, much to lose." Suzanne E. Mounts, *Public Defender Programs, Professional Responsibility, and Competent Representation*, 1982 Wis. L.Rev. 473, 482 (1982).

2. The plaintiff in a malpractice suit has a very difficult burden of proof in that he or she must demonstrate that with adequate counsel, he or she would have obtained a more favorable outcome.

*Public Defender Malpractice Liability in California,* 11 Whittier L.Rev. 535, 542 (1989).

While the cost in resources to defend such claims may be high and the resources of the public defender's office are limited, this does not justify denying a remedy to indigent clients which is available to other defendants who are more economically advantaged.