OPINION OF THE COURT BY JUSTICE KELLER
"I think the first duty of society is justice." Wendell Phillips, Disunion: Two Discourses at Music Hall (Jan. 20, *251 1861 and Feb. 17, 1861). "Seeing that all men are born equal, our first civil duty is to see that our laws treat them so." Id. To this end, it is a strong tradition within our nation that all those charged with a crime are entitled to the effective assistance of counsel, no matter their financial assets. "[I]n our adversary system of criminal justice, any person haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him. ... The right of one charged with crime to counsel may not be deemed fundamental and essential to fair trials in some countries, but it is in ours." Gideon v. Wainwright, 372 U.S. 335, 344, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). A defendant "requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence." Id. at 345, 83 S.Ct. 792 (quoting Powell v. Alabama, 287 U.S. 45, 68-69, 53 S.Ct. 55, 77 L.Ed. 158 (1932) ).[1]
It is with this respectful stance that we must today examine the role of the public defender within the greater governmental composition. The parties before us ask this Court to determine whether a public defender, as an employee of the Department of Public Advocacy (DPA), a statutorily-created agency of the Commonwealth, is entitled to qualified immunity within our overall immunity analysis. The Hardin Circuit Court and Court of Appeals determined that these attorneys are entitled to claim the defense of qualified immunity. After thorough examination of our case law and the history and treatment of public defenders, we affirm those holdings and determine that employees of the DPA are entitled to assert qualified immunity within the proper context.
I. BACKGROUND
Steven M. Jacobi was appointed a public defender after being indicted in Hardin County. F. Larry Holbert, then an attorney with the local office of the DPA, served as Jacobi's counsel. In August 2003, Holbert facilitated a plea agreement on Jacobi's behalf in two separate cases. Jacobi was ultimately found guilty of manufacturing methamphetamine (gun enhanced), manufacturing methamphetamine (second offense), and possession of drug paraphernalia (second offense). Each case had a recommended concurrent sentence of twenty years and the two cases were to run consecutively for a total forty-year sentence. The sentences were, however, probated for five years.
In 2004, Jacobi's probation was revoked, and he was ordered to serve his forty-year sentence. In 2007, Jacobi was informed he was required to serve 85% of his sentence, pursuant to Kentucky Revised Statute (KRS) 439.3401, before parole eligibility, because he qualified as a "violent offender." He subsequently filed for post-conviction relief and the Court of Appeals, after the trial court's initial denial without hearing, required the circuit court to conduct a hearing as this mistake in advice could have been ineffective assistance of counsel. The prosecution and defense, instead, agreed to vacate the judgment of conviction and entered a newly-negotiated guilty plea. After being sentenced to a total twenty-year sentence, Jacobi was ultimately discharged from custody.
After his release, Jacobi filed a malpractice action against Holbert in Hardin Circuit Court in 2015, alleging that as a result *252 of Holbert's negligent advice regarding parole eligibility, Jacobi had served years longer in prison than he expected when entering his guilty plea. The circuit court granted Holbert's motion to dismiss, finding that Holbert was entitled to qualified official immunity from suit. The Court of Appeals affirmed the trial court's dismissal, determining that Holbert, as an employee of the DPA was entitled to invoke the defense of qualified immunity in these circumstances. We granted discretionary review to resolve this important issue within our criminal justice system.
II. STANDARD OF REVIEW
"[W]hether a particular defendant is protected by official immunity is a question of law ... which we review de novo. " Rowan County v. Sloas, 201 S.W.3d 469, 475 (Ky. 2006) (citing Jefferson County Fiscal Court v. Peerce, 132 S.W.3d 824, 825 (Ky. 2004) and Estate of Clark es rel. Mitchell v. Daviess County, 105 S.W.3d 841, 844 (Ky. App. 2003) ). Additionally, "a motion to dismiss for failure to state a claim upon which relief may be granted is a pure question of law, a reviewing court owes no deference to a trial court's determination; instead, an appellate court reviews the issue de novo. " Fox v. Grayson, 317 S.W.3d 1, 7 (Ky. 2010) (emphasis added) (citing Morgan v. Bird, 289 S.W.3d 222, 226 (Ky. App. 2009) ). The posture of the case before us is a dismissal on the grounds of immunity, leaving only a legal question for us to resolve. Thus, we review this issue before us de novo, without deference to the determinations of the lower courts.
III. ANALYSIS
A. THE IMMUNITY ANALYSIS FRAMEWORK
" 'Official immunity' is immunity from tort liability afforded to public officers and employees for acts preformed in the exercise of their discretionary functions." Yanero v. Davis, 65 S.W.3d 510, 521 (Ky. 2001). This extension of immunity stems from the immunity bestowed upon the agency for which they work: "the officer's or employee's actions are afforded the same immunity, if any to which the agency, itself, would be entitled[.]" Id. at 522. Thus, "[w]hether an entity is a government agent is a threshold consideration in governmental immunity analysis." Caneyville Volunteer Fire Dept. v. Green's Motorcycle Salvage, Inc., 286 S.W.3d 790, 802 (Ky. 2009). This must be decided preliminarily because an agent or employee's immunity is an extension of the agency's immunity from the state; without the agency's immunity, the employee can have none. A state agency "is entitled to immunity from tort liability to the extent that it is performing a governmental, as opposed to a proprietary, function." Id. at 804 (quoting Yanero, 65 S.W.3d at 519 (citing 72 Am.Jur.2d, States, Territories and Dependencies, § 104 (1974) ) ).
Thus, we must first determine whether the DPA itself is a state agency to which immunity has been granted. "Governmental immunity extends to state agencies that perform governmental functions (i.e., act as an arm of the central state government) and are supported by money from the state treasury." Autry v. Western Kentucky University, 219 S.W.3d 713, 717 (Ky. 2007).[2] But only when an agency was *253 "created to perform a governmental function" does the immunity of the state extend to that agency. Id. (citing Kentucky Center for the Arts Corp. v. Berns, 801 S.W.2d 327 (Ky. 1990) ). This analysis turns upon "what an agency actually does." Autry, 219 S.W.3d at 717.
If the agency is determined to be clothed in immunity, we must resolve whether the agency's immunity extends to the particular acts of the employee in question. "Qualified official immunity applies to public officers or employees if their actions are discretionary (i.e., involving personal deliberation, decisions, and judgment) and are made in good faith and within the scope of their authority or employment." Caneyville Volunteer Fire Dept., 286 S.W.3d at 808-09 (quoting Autry, 219 S.W.3d at 717 ). Outside of these discretionary acts, made in good faith and within the scope of employment or authority, these employees are not entitled to qualified immunity when they are sued in their individual capacities.
B. THE ROLE OF THE DPA
The first determination we must make involves assessing what the DPA actually does. See Autry, 219 S.W.3d at 717. In 1972, at the request of Governor Wendell Ford, the General Assembly created the Office of Public Defender, now known as the DPA. "Who We Are," https://dpa.ky.gov/who_we_are/Pages/default.aspx (last visited June 27, 2018). The organization was tasked with "represent[ing] all persons in Kentucky charged with or convicted of a crime." Id. Each year, the agency handles over 140,000 trial and post-trial cases statewide. Id. The agency's legislative directive is now dictated by KRS Chapter 31. The DPA was established "as an independent agency." KRS 31.010. "[I]n order to provide for the establishment, maintenance, and operation of a state-sponsored and controlled system," KRS 31.010, the DPA is tasked with "[t]he representation of indigent persons accused of crimes or mental states which result in their incarceration or confinement[,]" KRS 31.010(1), as well as "[t]he pursuit of legal, administrative, and other appropriate remedies to ensure the protection of the rights of persons with disabilities[.]" KRS 31.010(2).
Historically, the DPA in Kentucky has been underfunded and overworked. In 2014, public defenders were appointed in 156,699 cases, averaging out to about 472 new cases per year per each public defender. David Serchuk, Kentucky Bar Association task force seeks to increase funding for burdened public defenders, INSIDER LOUISVILLE (June 19, 2015), https://insiderlouisville.com/government/kentucky-bar-association-creating-task-force-increase-funding-states-public-defenders/. This number has continued to rise. In the DPA's 2017 Annual Litigation Report, the organization reported 163, 158 total trial and post-trial cases, averaging 459 per attorney with only $276 funding per each case. DEPARTMENT OF PUBLIC ADVOCACY , ANNUAL LITIGATION REPORT ABOVE AND BEYOND: NOT THE PROBABLE , THE POSSIBLE FISCAL YEAR 2017, 2 (2017).
Yet, despite these challenges, the DPA continues to strive to perform its legislatively-directed tasks. These tasks are not limited to the important role of representing every single indigent defendant who requests, and is entitled to, an attorney. KRS 31.030 lists multiple authorities and duties for the DPA and even states that the list is not exhaustive. Some of these tasks include "promulgating standards and administrative regulations, rules, and procedures[,]" KRS 31.030(4) ; "[c]onducting *254 research into, and developing and implementing methods of, improving the operation of the criminal justice system with regard to indigent defendants and other defendants in criminal actions," KRS 31.030(8) ; and to "seek and apply for and solicit funds for the operation of the defense of indigent persons or protection of the persons with disabilities programs from any source, public or private ..." KRS 31.030(12). These are just a few of the diverse and far-reaching tasks the DPA continues to undertake towards the goal of universal justice in the Commonwealth.
C. THE DPA IS A STATE AGENCY AND ITS EMPLOYEES ARE, THEREFORE, ENTITLED TO QUALIFIED IMMUNITY
State agencies performing governmental functions are clothed in immunity. Autry, 219 S.W.3d at 717. This analysis has led to many twisting paths for our Court as the government has developed numerous quasi-governmental agencies, independently contracted for services with other businesses performing proprietary work, and expanded into fields outside what was probably the original intent of our founders. However, this is the framework with which we must analyze the DPA. Given these foundational principles and the aforementioned duties and history of the DPA, we have no hesitation in holding that the DPA is a state agency. The DPA is a legislatively-created agency, it is performing an essential governmental function, and its legal liability directly affects the public treasury. For all these reasons, the DPA is clearly a state agency to which governmental immunity is extended. Because the agency is sheltered by the defense of immunity, its employees performing discretionary acts are also able to claim the defense of immunity.[3]
1. The DPA is a legislatively created arm of the government
The Kentucky legislature specifically created the DPA to address the need for counseling and advocating on behalf of indigent defendants. In 1972, the General Assembly created the agency and it has remained in effect since that time. The statutes governing the agency have been amended in some ways but the agency itself remains constant as its employees continue to advocate for our indigent population. Although not necessarily conclusive, this factor-creation by the General Assembly-weighs in favor of finding that the DPA is a state agency. It is treated as an extension of the Commonwealth itself. But, as stated in Autry, that agency must also be performing a governmental function.
2. The DPA is performing an essential governmental function, rather than a proprietary function
An integral portion of our immunity analysis requires us to determine what the agency in question does and whether that is an essential governmental function. For example, this Court had to determine whether fire departments *255 were entitled to an immunity defense. In holding the department in question was entitled to immunity, we stated that "fire departments perform a paradigmatic function of the government in keeping the populous and its property safe from fire." Caneyville Volunteer Fire Dept., 286 S.W.3d at 799. Public defenders, in comparison, serve the "paradigmatic function of the government in keeping the populous and its progeny safe from" wrongful convictions. While most of the public officials in our great Commonwealth are hard-working, justice-seeking, and ethical, the public defender is ever-present to ward off the dangers of those who would seek to turn justice asunder. They are guardians of liberty and this safe-keeping task cannot be treated lightly.
"Where justice is denied, where poverty is enforced, where ignorance prevails, and where any one class is made to feel that society is an organized conspiracy to oppress, rob and degrade them, neither persons nor property will be safe." Frederick Douglass, Address in Washington, D.C. on the 24th anniversary of Emancipation (1886). It cannot be denied that this agency is designed to help ensure the sanctity of our justice system. We cannot ignore that it is a heady undertaking for our government to guarantee the right to counsel under both the federal and state constitutions, pursuant to the judicial decree of Gideon v. Wainwright. It is only through the actions and hard work of the DPA that this challenge and obligation can be achieved. We hold that the assurance of justice for indigent defendants is an essential governmental task. Not only is it essential but it is constitutionally-mandated. Without the legislative creation of the DPA, these indigent defendants would be subject to the whims of a turbulent procedural mire, swung to and fro without hope of finding solace. It is our government's prerogative and responsibility to provide for the constitutional rights of such defendants.
Often, the governmental function analysis is contrasted to proprietary undertakings that an agency may partake in. "A proprietary function is of the type normally engaged in by businesses or corporations and will likely include an element of conducting an activity for profit." Caneyville Volunteer Fire Dept., 286 S.W.3d at 804 (citing Schwindel v. Meade County, 113 S.W.3d 159, 168 (Ky. 2003) ). Despite Appellant's arguments, the DPA is not performing a proprietary task. The purpose of the distinction between governmental and proprietary functions is to create
a reasonable compromise between allowing state agencies to perform their governmental functions without having to answer for their decisions in the context of tort litigation, and allowing private enterprises to pursue their legitimate business interests without unfair competition from government agencies performing purely proprietary functions without the same costs and risks inherent in commercial enterprise.
Caneyville Volunteer Fire Dept., 286 S.W.3d at 804 (quoting Yanero, 65 S.W.3d at 521 ). A government agency's immunity is limited to governmental tasks rather than allowing it an unfair advantage when partaking in profit-seeking ventures. Although legal representation can be a proprietary function, for DPA attorneys, it is not done for a proprietary purpose. It is intended as the fulfillment of the Commonwealth's responsibility to provide counsel for indigent defendants. DPA attorneys are paid but the agency itself is not in its business for profit. In fact, KRS 31.215(1) specifically prohibits appointed attorneys from accepting fees for the representation *256 of indigent defendants. DPA attorneys are not at an unfair commercial advantage to private attorneys; they are representing parties that would be unable to pay attorneys in the private sector. The agency consistently fulfills its goals while being consistently underfunded. The DPA is clearly not functioning as a profit-driven entity.
3. The DPA is supported by the state treasury
Historically, the justification for the theory of sovereign immunity is to limit the negative impact legal liability can have upon the public treasury. See Coppage Construction Co., Inc., 459 S.W.3d at 865 (Venters, J., concurring). "[T]he historical origin of the doctrine of sovereign immunity was, in part, the protection of the king's purse." Id. If legal liability for the agency in question would jeopardize the public treasury, then there is a strong justification for the agency being immune from suit, subject to limitations or waiver by the legislature. The DPA is funded through the budget created by the Kentucky General Assembly; the funds come directly from the Commonwealth's treasury. See DEPARTMENT OF PUBLIC ADVOCACY , ANNUAL LITIGATION REPORT ABOVE AND BEYOND : NOT THE PROBABLE , THE POSSIBLE FISCAL YEAR 2017, 3 (2017). Public defenders are paid by the state treasury; they pay into the retirement system. The historical justification for sovereign immunity is present here. Increasing costs for the DPA in defending against malpractice suits would inevitably trickle down to taxpayers and ultimately negatively impact the entire state and the indigent defendants being represented.
4. This immunity extends to public defenders as employees of the DPA
For all these reasons, we hold that the DPA is a state agency clothed in governmental immunity. As such, public defenders, as employees of the DPA, are, in certain circumstances, entitled to assert qualified immunity as a defense. "[P]ublic employees acting in their individual capacities are entitled only to official immunity for their discretionary acts occurring within the scope of their employment." Commonwealth of Kentucky Board of Claims v. Harris, 59 S.W.3d 896, 899 (Ky. 2001) (citation omitted). Thus, whether Holbert is entitled to qualified immunity under these circumstances turns on whether his actions in advising Jacobi were "discretionary." We will address this issue in turn; however, we must first explain the significance of the decision that public defenders are employees of the state. Appellant seems to argue that this label somehow significantly affects the independent exercise of judgment that public defenders can utilize in advising their clients. We disagree.
i. DPA attorneys may be "employees" of the state but are still empowered to act independently to represent their clients
Appellant argues that the immunity analysis should begin and end with whether a public defender acts as an "agent" of the Commonwealth. But this is a misrepresentation of our immunity analysis. The question is not limited to whether the specific employee is an "agent" of the Commonwealth but whether the agency for which he or she works is an agent of the Commonwealth. As held herein, the DPA is a state agency entitled to governmental immunity. Appellant does correctly state that public defenders are agents of their clients alone, rather than serving the interests of another party; however, this does not mean that public defenders cannot be employees of the Commonwealth. The descriptions are not mutually exclusive. Appellant misunderstands from *257 where a public employee's immunity stems; it is an extension of the agency's immunity rather than a determination made on individual levels for each employee. The employee and his or her acts specifically come into consideration in the discretionary versus ministerial analysis. Agent and employee are not interchangeable terms; simply because a public defender is the legal agent of his indigent client does not mean he is no longer employed by the Commonwealth.
Additionally, a public defender's employment by the Commonwealth does not diminish his independent agency in advocating for his client. The Kentucky Supreme Court rules still dictate the bounds of a public defender's ethical behavior. Even though the coffers of the Commonwealth's treasury are utilized in paying the public defender, the public defender can still exercise independent judgment in representing his or her client. Appellant argues that holding public defenders are DPA employees entitled to qualified immunity will ipso facto remove the independent nature of a public defender's representation of clients. This is simply a legal fallacy. The DPA works independently and establishes its own rules and administrative procedures to maintain this independent representation. If an indigent defendant ever feels the need to raise the issue of independent advice of counsel, it is an issue distinct from the immunity analysis. Here, we must judge the immunity of the DPA as a whole within a larger framework. And there is no fundamental basis for finding that payment by the Commonwealth will affect the ability of public defenders to independently represent their clients. Public defenders are not paid by a merit system; their salary is not linked to the success or failure of their clients' cases. There is no reason to assume that being an employee of the Commonwealth affects the independent representation of indigent clients by public defenders.
ii. Public defenders act as adversaries to prosecutors, not to the interests of the Commonwealth
Appellant also premises his argument on the idea that public defenders, as representatives of an indigent criminal defendant, are working adverse to the interests of the Commonwealth and its citizens. This is simply not so. Providing legal counsel to indigent persons is a very integral interest of the Commonwealth at large. "The public defender's role is that of an adversary to the prosecutor-not an adversary of the system but an integral part of it." Stephen L. Millich, Public Defender Malpractice Liability in California, 11 WHITTIER L. REV. 535, 537 (1989). Our criminal justice system is an adversarial one; however, its adversarial nature is, in essence, of benefit to the Commonwealth itself. Prosecutors protect society by attempting to protect citizens from criminal behavior. Judges ensure the neutral and unbiased nature of the system. Public defenders, in turn, protect society by ensuring that indigent defendants are treated equally by the system and that every defendant has an equal opportunity for defending himself. These are vital interests for a civilized society. Despite public defenders acting as adversary to prosecutors, they are acting in advance of society's interests as a whole: the interest of having a fair, equal, and just criminal system.
D. PUBLIC POLICY SUPPORTS THE GRANTING OF IMMUNITY TO PUBLIC DEFENDERS
"It is beyond challenge that public policy is determined by the constitution and the legislature through the enactment of statutes."
*258 Giuliani v. Guiler, 951 S.W.2d 318, 321 (Ky. 1997). "However, when those organs of public policy are silent, the decision can be made by the courts." Id. (citing Chreste v. Louisville Railway Co., 167 Ky. 75, 180 S.W. 49 (1915) ; Kentucky State Fair Bd. v. Fowler, 310 Ky. 607, 221 S.W.2d 435 (1949) ; Commonwealth v. Wilkinson, 828 S.W.2d 610 (Ky. 1992) ). "In the absence of a legislative decree, courts may adopt and apply public policy principles." Giuliani, 951 S.W.2d at 321. Based on this language in our precedent, we believe it permissible to examine the public policy of our decision. Given that the legislature has chosen to entrust the DPA with such a sanctified responsibility, it has clearly empowered the agency with trust and governmental responsibilities. The holding of immunity for public defenders is soundly based in law; however, it is also therefore firmly supported by many public policy principles.
1. Public defenders have no discretion in choosing clients or cases
The threat of a malpractice action can often be mitigated, although not eliminated, by using discretion in taking on clients and cases. A public defender, however, has no such discretion. "[A] public defender may not reject a client, but is obligated to represent whomever is assigned to her or him, regardless of her or his current caseload or the degree of difficulty the case presents." Dziubak v. Mott, 503 N.W.2d 771, 775 (Minn. 1993).
The public defender, once appointed, cannot refuse to represent unpopular or obnoxious clients, but a private attorney usually can. Economically, the public defender cannot charge a fee to cover a malpractice insurance premium, but a private attorney can and will. In addition, a public defender is paid at the same rate for a murder case as for a reckless driving defense, which may not be the case for a successful private practitioner.
Stephen L. Millich, Public Defender Malpractice Liability in California, 11 WHITTIER L. REV. 535, 538 (1989). The public defender has no possible tools to utilize in protecting himself or herself from the threat of malpractice action by disgruntled clients. They must take every case in which the court deems appointment necessary. The public defender is unable to manage the practice of law in a proprietary and risk-reducing manner like private practitioners. This difference directly relates to the fact that public defenders are responsible for undertaking a governmental task, without distinction of who requests the service if that person is indigent. As such, it is sensical to allow the DPA's immunity to extend to public defenders, as a governmental mitigation for the risks which DPA attorneys are required to accept.
2. Public defenders are working in an underfunded and overworked environment
It is common knowledge, and has been cited to herein, that the DPA is a government agency that consistently works with scarce resources, limited funding, and an ever-increasing workload. "An increasing crime rate and an economic climate which has resulted in increased claims of indigency and lower state budgets to fund government positions have caused public defender caseloads to grow dramatically." Dziubak, 503 N.W.2d at 776 (citation omitted). This situation is not unique to any one jurisdiction. Nationwide, public defenders are overworked and underpaid. Yet, as a society, we continue to rely upon them to protect the legal interests of indigent defendants. These attorneys continue to endeavor to accomplish this lofty goal, despite their limited resources. "It would be an unfair burden to subject the public *259 defender to possible malpractice for acts or omissions due to impossible caseloads and an under-funded office: something completely out of the defender's control." Id. Often, public defenders' actions and abilities in a case are limited by the government's budget; as such, it is common sense to extend governmental immunity to their actions as protection for these shortages. The public defender does everything he or she can with the resources given him or her; it would be an unfair burden to hold them responsible for shortages not of their own making.
3. Court-appointed attorneys are an essential facet of our criminal justice system and should be immune from suit, just like judges and prosecutors
Judges, prosecutors, and public defenders are a protective unit for the criminal justice system. They work in tandem to protect the various interests of society and defendants within our criminal process. Prosecutors enjoy absolute immunity in some situations and qualified immunity in others. See McCollum v. Garrett, 880 S.W.2d 530, 534 (Ky. 1994). Judges are also immune for "any judicial act." Baker v. Fletcher, 204 S.W.3d 589, 595 (Ky. 2006). "Immunity exists to free government officials from the burdensome consequences of litigation." Dziubak, 503 N.W.2d at 776. "We perceive no valid reason to extend this immunity to state and federal prosecutors and judges and to withhold it from state-appointed and state-subsidized defenders." Id. at 777 (quoting Brown v. Joseph, 463 F.2d 1046, 1048-49 (3d Cir. 1972) (citation omitted) ). "Immunity [for public defenders] preserves the criminal justice system which relies upon the judge, prosecutor and public defender as essential participants. This serves the best interests of indigent defendants and of society as a whole." Dziubak, 503 N.W.2d at 777. "The judge, district attorney, and public defender are parts of a courtroom triumvirate. Each has a function which is essential to the working of the system." Stephen L. Millich, Public Defender Malpractice Liability in California, 11 WHITTIER L. REV. 535, 537 (1989). The public defender's "experience [ ] and full time devotion to the defense of criminally accused indigents results in an increased professionalism which helps the system function better. Thus, society reaps the benefit from a smoother functioning criminal justice system." Id. at 538. These three parts of the system are all essential cogs in the machine of criminal justice. Without one, the system can grind to a halt, often punishing participants and society in the process. Thus, we perceive no reason to exempt public defenders from the immunity process while prosecutors and judges receive the benefit of the defense.
4. Failing to immunize public defenders in these situations would have a chilling effect on indigents' representation
"The potential 'chilling effect' that the threat of legal malpractice suits has against court appointed contract attorneys without some qualified immunity is especially evident considering the unique relationship between [an appointed] attorney and his client." Browne v. Robb, 583 A.2d 949, 952 (Del. 1990). A public defender cannot "weigh[ ] the threat and potential for gain in bringing litigation or even reject his client if the merits of the case were not worthy." Id. (citation omitted). "Representation of an indigent client is not a mere voluntary undertaking, but is part of a lawyer's obligation[.]" Id. Appointed attorneys "do not have the ability, which they ordinarily would possess in the marketplace, to reject such clients or cases." Id. Given these considerations, the Delaware Court determined that "a failure to recognize ... qualified immunity would *260 unnecessarily 'chill' ..." the state's contract attorney system for indigent defendants. Id.
Immunizing public defenders "ensure[s] that the public defender will be devoted solely to the client's case without concern for subsequent personal liability." Stephen L. Millich, Public Defender Malpractice Liability in California, 11 WHITTIER L. REV. 535, 542 (1989). "The conflict of interest disappears and the defendant receives quality representation. This also ensures that the criminal justice system works as it is supposed to work, i.e., the public defender effectively represents the client to the best of that lawyer's ability within the established rules." Id. We believe, like the Delaware courts, that a failure to recognize this immunity for our public defenders could have a chilling effect upon the public defender representation system. By extending the DPA's immunity to public defenders, the public defender can concern herself solely with representing the indigent defendant to the fullest of her ability, rather than be constantly concerned with how a shortage of funds or resources could lead to a malpractice lawsuit. It encourages cooperation and the maximum effort for resolving each case in a defendant's favor. Failing to recognize this immunity could potentially stifle the public defender's ability to fully work with her client, finding herself at odds with the indigent defendant; she could be distracted, struggling to keep a client happy to avoid a lawsuit rather than continuing to represent the client's interests and keep the wheel of justice consistently moving. Recognizing this immunity is in the interest of public defenders, indigent defendants, and the community.
5. Limited resources of the DPA should be utilized in defending accused persons, rather than defense of malpractice claims
This Court has recognized that there are inherent "social costs" to litigation with a governmental entity: "the expenses of litigation, the diversion of official energy from pressing public issue, and the deterrence of able citizens from acceptance of public office." Caneyville Volunteer Fire Dept., 286 S.W.3d at 810 (quoting Crawford-El v. Britton, 523 U.S. 574, 591, n.12, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998) (internal citation omitted) ). The Minnesota Supreme Court determined that without immunity for the public defender, "the cost and burden of defending civil claims will only exacerbate" the harsh underfunded situation these offices face each day. Dziubak, 503 N.W.2d at 776. "In the end, this would hurt indigent defendants, not help them." Id. "[R]esources consumed to defend against malpractice suits filed against public defenders would take away from the already limited resources available to serve the indigent constituency." Id. "Immunity from suit for public defenders best serves the indigent population in preserving the resources of the defender's office for the defense of the criminally accused." Id. at 777. Public defenders already work in an economically stunted environment; allowing malpractice suits to deplete those resources further would be averse to the interests of society.
6. Public defenders encourage the effective function of the criminal justice system
"The accused defendant is not the sole beneficiary [of the public defender system]. Society as a whole depends upon the role of defense counsel to secure an ordered system of liberty and justice, as ordained by our Constitution." Id. As stated, public defenders serve a purpose within this Commonwealth's system of criminal justice. We cannot stress enough the importance of this role to protect indigent defendants. When we as a Commonwealth *261 strive to protect this "ordered system" of justice, we protect the goal of a fair and just system of liberty. This aim is an ever-moving target, an ongoing process, but public defenders continue to protect that aspiration.
E. LEGAL COUNSEL INVOLVES DISCRETIONARY DECISIONS
We have held that the DPA is a state agency performing a governmental task. As such, the agency's immunity extends to its employees performing discretionary tasks. "When performance of the job allows for the governmental employee to make a judgment call, or set a policy, the fact that there is uncertainty as to what acts will best fulfill the governmental purpose has resulted in immunity being extended to those acts where the governmental employee must exercise discretion." Marson v. Thomason, 438 S.W.3d 292, 296 (Ky. 2014). "[A] discretionary act is usually described as one calling for a 'good faith judgment call[ ] made in a legally uncertain environment.' " Id. at 297 (quoting Yanero, 65 S.W.3d at 522 ). It "involve[es] the exercise of discretion and judgment, or personal deliberation, decision, and judgment." Marson, 438 S.W.3d at 297 (quoting Yanero, 65 S.W.3d at 522 ). "[D]iscretionary acts or functions are those that necessarily require the exercise of reason in the adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued." Haney v. Monsky, 311 S.W.3d 235, 240 (Ky. 2010).
The act of advising a client is, at its core, a discretionary function. It involves examining the legal landscape, the multi-faceted issues within each separate case, determining what is important and which facts are negligible, taking into consideration the background and history of each individual client, and ultimately deciding the best course of action to take in each case. This is clearly a discretionary task. The analysis is not as black and white as Appellant argues; it is not a ministerial task to simply advise correctly. The law is a field of gray in a world of black and white; as lawyers, we are consistently taught that the answer "depends" upon numerous factors. What is right in each situation may change with the slightest fluctuation in the facts presented to the attorney. We cannot say that this is a ministerial task. We are not saying that the task facing a public defender will always be discretionary; these issues, like the law, are not so black and white or bright-line. But, in this case, in advising a client, the public defender here was performing a discretionary task. As such, Holbert was entitled to assert qualified immunity as a defense to Jacobi's legal malpractice claim. Jacobi did not allege that Holbert acted in bad faith or outside the scope of his employment. We therefore affirm the holdings of both the Hardin Circuit Court and the Court of Appeals in dismissing Jacobi's action on the basis of immunity.
F. THIS DECISION DOES NOT NEGATIVELY AND DISCRIMINATORILY IMPACT THE RIGHTS OF INDIGENT DEFENDANTS
At oral argument, Appellant seemed to argue that allowing public defenders to assert immunity would leave indigent defendants as the only group unable to sue their attorneys for malpractice. This broad statement is inaccurate and misleading. The General Assembly has made a limited waiver of immunity for negligence claims sustained due to the actions of agency employees, stemming from ministerial actions. See KRS 49.020(1) and KRS 49.060. By statute, the Kentucky Claims Commission (commonly referred to *262 as the "Board of Claims") is authorized to hear these claims of negligence. Jacobi has alleged negligence on the part of his counsel, Holbert, a state agency employee. Our recognition of Holbert's qualified immunity does not foreclose all potential remedies for Jacobi; instead, it merely recognizes that the proper avenue for recovery of negligence against public employees is by statute and through the Claims Commission. This is a rational limitation of liability for agency employees and does not foreclose all paths to recovery for indigent defendants. We make no finding as to the potential liability of all public defenders in negligence actions; here, the specific allegations deal with the legal counsel provided to Jacobi and involve discretionary acts. However, that does not mean that every action against a public defender would present the same set of facts and legal issues. Thus, this recognition of immunity does not discriminatorily impact the rights of indigent defendants.
IV. CONCLUSION
Public defenders are integral actors within the Commonwealth's justice system. The DPA is a state agency that, through the employ of public defenders, carries out an integral and essential governmental function: protecting the legal rights of indigent defendants. As such, public defenders performing discretionary tasks in good faith and within the scope of their employment are entitled to assert qualified immunity to any negligence claim. Jacobi did not allege that Holbert acted in bad faith or outside the scope of employment. Therefore, Holbert, in giving legal advice to an indigent defendant, was performing a discretionary task while employed by a state agency. He is entitled to the defense of qualified immunity. We therefore affirm the Hardin Circuit Court and the Court of Appeals in dismissing Jacobi's claims.
All sitting.
All concur.

See also Ky. Const. 11 ("In all criminal prosecutions the accused has the right to be heard by himself and counsel[.]") and U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy ... the Assistance of Counsel for his defence.").

This is a distinct analysis from that dictated by Comair, Inc. v. Lexington-Fayette Urban Cnty. Airport Corp., 295 S.W.3d 91 (Ky. 2009). The Comair analysis applies to "quasi-governmental" or "public" entities. Coppage Construction Co., Inc. v. Sanitation District No. 1, 459 S.W.3d 855, 859 (Ky. 2015). Where, as here, the agency in question is an actual agency of the Commonwealth, it must just be determined that it is a state agency performing a governmental function in order to be immune from suit.

We also note that, although Appellant cites to federal cases holding that federal public defenders are not immune in certain actions, these cases are not binding upon this Court. "[W]hen state law creates a cause of action, the State is free to define the defense to that claim, including the defense of immunity...." Ferri v. Ackerman, 444 U.S. 193, 198, 100 S.Ct. 402, 62 L.Ed.2d 355 (1979). "[W]e intimate no views as to a public defender's liability for malpractice in an appropriate case under state tort law." Polk County v. Dodson, 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981). These cases analyze federal public defenders under federal law and also examine the nature of a public defender as acting under color of law for purposes of § 1983 actions.