RENDERED: MARCH 14, 2019
TO BE PUBLISHED

# Supreme Court of Kentucky

# FINAL

2017-SC-000367-DG    DATE 4|4|19 Kim Redmon, DC

RODERICKA BRYANT                                              APPELLANT

ON REVIEW FROM COURT OF APPEALS
CASE NO. 2015-CA-001705-MR
V.        JEFFERSON CIRCUIT COURT NO. 12-CI-002309

LOUISVILLE METRO HOUSING                                     APPELLEES
AUTHORITY AND JUANITA MITCHELL

## OPINION OF THE COURT BY JUSTICE KELLER

## AFFIRMING

This case arises out of the tragic death of three-year-old Davion Powell.

His mother, Rodericka Bryant, took him with her to visit her friend, Terrah

Love, at Love's apartment building, The 550 Apartments (Apartments).

Roderick Moss, who was involved in an ongoing feud with Love and others,

came to the complex and began shooting. One of the stray bullets hit Davion

and he ultimately died from the injuries.[1]  Bryant then sued Louisville Metro

---

[1] Roderick Moss is currently serving a ten-year prison sentence for the charge of manslaughter, second-degree, related to Davion's death, as well as other charges arising out of the shooting.

Housing Authority (LMHA), the owner and property management company of Apartments, and Juanita Mitchell, the property manager, for their failure to evict Love, thereby negligently causing Davion's death. Both the circuit court and the Court of Appeals held that LMHA was cloaked in governmental immunity, and Mitchell was shielded by qualified official immunity; thus, Bryant's case was dismissed. Although we find the events of this case troubling and heartbreaking, we must affirm both courts and hold that LMHA and Mitchell are both protected by the immunity doctrine.

## I. BACKGROUND

In 2003, the City of Louisville and Jefferson County merged to form Louisville/Jefferson County Metropolitan Government (Louisville Metro), pursuant to Kentucky Revised Statutes (KRS) Chapter 67C.[2] Louisville Metro is entitled to sovereign immunity as a matter of statute.[3] As part of this merger, the former Housing Authority of Louisville and the former Housing Authority of Jefferson County were also merged into a new entity: LMHA. LMHA is governed pursuant to KRS Chapter 80, which provides that authorities can be created "for the purpose of providing adequate and sanitary living quarters for individuals or families[.]" KRS 80.020(1).

---

[2] "The governmental and corporate functions vested in any city of the first class shall, upon approval by the voters of the county at a regular or special election, be consolidated with the governmental and corporate functions of the county containing the city. This single government replaces and supersedes the governments of the pre-existing city of the first class and its county." KRS 67C.101.

[3] "A consolidated local government shall be accorded the same sovereign immunity granted counties, their agencies, officers, and employees." KRS 67C.101(2)(e).

As part of that purpose, LMHA owns, operates, and manages thousands of units available for low-income housing throughout Jefferson County. Most of LMHA's budget comes from federal funding and grants but LMHA also utilizes some state and local government funds. LMHA owns and operates Apartments as subsidized, public housing for low-income individuals and families pursuant to this purpose. Juanita Mitchell served as Apartments' property manager.

Terrah Love became a tenant at Apartments in February of 2008. Her rent was $45 per month. In September 2008, Mitchell sent Love a "30 Day Lease Termination Letter with 'No Right to Cure'", citing "Material Non-Compliance with the Rental Agreement or Resident Rules." In that letter, Mitchell specifically cited to Section 7 of the Lease Agreement, which provided that the Resident and the Resident's guests and visitors must refrain from "conduct which ... [i]s unlawful, unsafe, irresponsible, disorderly or violent or a hazard to the safety of any persons or property, including Resident, Household members, visitors, neighbors or Management staff[.]" According to Mitchell, this violation arose from an allegation that Love was allowing persons not listed on the lease to live in the apartment. On April 13, 2010, a forcible detainer judgment was entered against Love; however, no further action was taken, and Love remained a tenant at Apartments.

On February 3, 2011, Love was cited with a "Warning Letter" from Apartments. The letter stated that Love had violated the lease by harboring pit bulls and creating a disturbance for neighbors through loud noise and music.

On February 8, 2011, the Louisville Metro Police Department responded to a report of violence between Love and a boyfriend in front of her children. Love was initially charged with assault, fourth degree, however, it appears that her charges were later dismissed. In April, Love was sent a "14 Day Lease Termination Letter." Mitchell once again cited to Section 7 of the Lease. Love attempted to pay her rent in April, but Mitchell sent the payment back to Love, stating that because of the 14-day termination, Mitchell and Apartments could not accept the payment.

Mitchell also completed what was called a Form A, which states grounds for eviction in relation to a certain tenant. Mitchell stated that she had filled out such a document regarding Love and reported that LHMA had been notified that Love had been involved in "shootings and physical fights with other residents." Mitchell retired on April 30, 2011. Mitchell's successor also completed Form A as to Love and LMHA filed a forcible detainer action against Love on May 12, 2011.

However, before Love was evicted, tragedy struck. Love had been in an ongoing feud with another woman, Taneisha, over a man they were both seeing. It seems that Moss was friends with Taneisha and decided to take matters into his own hands. He approached Love's apartment on May 13, 2011. Love and several friends were gathered outside the apartment complex while the children, including Davion, were inside playing. Moss took out a gun and began shooting. As a result, Davion was shot in the head and succumbed to his injuries three days later.

4

## II. STANDARD OF REVIEW

"The issue of whether a defendant is entitled to the defense of sovereign or governmental immunity is a question of law." *University of Louisville v. Rothstein*, 532 S.W.3d 644, 647 (Ky. 2017) (citing *Rowan County v. Sloas*, 201 S.W.3d 469, 475 (Ky. 2006) (citing *Jefferson County Fiscal Court v. Peerce*, 132 S.W.3d 824, 825 (Ky. 2004))). This Court reviews questions of law *de novo*. *See Rothstein*, 532 S.W.3d at 647 (citing *Cumberland Valley Contractors, Inc. v. Bell County Coal Corp.*, 238 S.W.3d 644, 647 (Ky. 2007)).

## III. ANALYSIS

### A. The Immunity Analysis Framework

Although the field of immunity is an oft-confusing one, "[t]he one clear thing is that pure sovereign immunity, for the state itself, has long been the rule in Kentucky." *Comair, Inc. v. Lexington-Fayette Urban County Airport Corp.*, 295 S.W.3d 91, 94 (Ky. 2009). However, "[t]he reach of sovereign immunity becomes more complicated when dealing with governmental and quasi-governmental entities and departments below the level of the Commonwealth itself." *Id.* Although LMHA appears to have argued at some point in the courts below that it was entitled to *sovereign* immunity, that argument must fail as *sovereign* immunity is limited to the Commonwealth itself, as well as counties and governments formed according to statute. Thus, while Louisville Metro maintains sovereign immunity, LMHA, even as a state agency, would never be entitled to sovereign immunity. The immunity analysis for LMHA must turn on the existence or absence of *governmental* immunity.

5

Governmental immunity is itself an extension of sovereign immunity, thus exhibiting why the terms are often used interchangeably. It is based in the concept that "sovereign immunity should 'extend ... to departments, boards or agencies that are such integral parts of state government as to come within regular patterns of administration organization and structure.'" *Id.* at 99 (quoting *Kentucky Center for the Arts v. Berns*, 801 S.W.2d 327, 332 (Ky. 1990) (internal quotation marks omitted)). Thus, in *Comair*, this Court developed and attempted to clarify a "test" to determine whether the sovereign immunity of the state should be extended to a governmental entity:

> First, the courts must look to the origin of the public entity, specifically: "was [the entity in question] created by the state or a county [which are entitled to immunity], or a city [which is not entitled to immunity except in the legislative and judicial realms]?" ... The second and "more important" inquiry is whether the entity exercises a "function integral to state government."

*Coppage Construction Co., Inc. v. Sanitation District No. 1*, 459 S.W.3d 855, 859 (Ky. 2015) (citing *Comair*, 295 S.W.3d at 99). We also recognize that "while the state enjoys immunity from suit, a level of constraint must be exercised in its application to other entities in order to respect both constitutional and important public policy limitations." *Coppage*, 459 S.W.3d at 859 (citations omitted). However, even administering the test with such restraint, we hold that LMHA is a governmental agency of the Commonwealth and is entitled to the protection of governmental immunity.

6

### B. *LMHA is entitled to governmental immunity*

In examining the *Comair* test, as well as historical and legislative points on immunity and housing authorities, we hold that LMHA is a governmental agency entitled to governmental immunity. First, its parent entity is Louisville Metro, a government protected by sovereign immunity. The statutes portray sufficient control for this prong of the *Comair* test to be met. Second, the purpose of LMHA is a governmental one and it is integral to a state function. Although many of the factors we consider in this determination are not as clearly defined when examining LMHA, the legislative directive in creating LMHA supports a holding that LMHA is shielded by governmental immunity.

### a. *State agency*

"Whether an entity is a government agent is a threshold consideration in governmental immunity analysis." *Jacobi v. Holbert*, 553 S.W.3d 246, 252 (Ky. 2018) (quoting *Caneyville Volunteer Fire Dept. v. Green's Motorcycle Salvage, Inc.*, 286 S.W.3d 790, 802 (Ky. 2009)). As we have made clear, governmental immunity is an extension of the parent's sovereign immunity. Here, LMHA was explicitly created, according to statute, by Louisville Metro. "A county 'is a political subdivision of the Commonwealth as well, and as such is an arm of the state government. It, too, is clothed with the same sovereign immunity' . . . . Therefore, absent an explicit statutory waiver, Metro Government is entitled to sovereign immunity." *Jewish Hospital Healthcare Services, Inc. v. Louisville/Jefferson County Metro Government*, 270 S.W.3d 904, 907 (Ky. App. 2008) (citing *Cullinan v. Jefferson County*, 418 S.W.2d 407, 408 (Ky. 1967),

*overruled on other grounds by Yanero v. Davis*, 65 S.W.3d 510, 527 (Ky. 2001)). Louisville Metro, then, is clearly cloaked in sovereign immunity.

Bryant argues that the statutory framework through which LMHA operates makes it a separate entity, and the immunity afforded to Louisville Metro should not be expanded to encompass LMHA. However, there is sufficient control authorized under KRS Chapter 80 to find a connection adequate for this prong of the *Comair* test. The housing authority is formulated pursuant to statute, with significant control by the Louisville Metro mayor and approval by the Louisville Metro Council. *See* KRS 80.266(1). The legislature prescribed the manner through which a housing authority can contract for certain services. "No contract or agreement with any contractor for the construction of low-income housing exceeding ten thousand dollars [] shall be made without advertising for bids. The bids shall be opened publicly and an award made to the best bidder, with power in the authority to reject any or all bids." KRS 80.130. The city attorney is statutorily authorized to conduct condemnation proceedings for the housing authority and "the form and manner of [such] proceedings shall be the same as that provided in the Eminent Domain Act of Kentucky." KRS 80.150. These statutes portray a definitive, albeit more removed than other agencies of the government, control from the legislative and executive branches over LMHA. This control is sufficient to find that the first prong of the *Comair* test is met. LMHA is a derivative agency of Louisville Metro.

### b. Integral state function

The more important question, however, is whether LMHA is performing an integral state function. "The question of whether an entity carries out an integral state function has remained the primary focus of our sovereign immunity analysis since at least the turn of the twentieth century." *Coppage*, 459 S.W.3d at 862 (citing *Comair*, 295 S.W.3d at 99 (citing *Gross v. Kentucky Bd. of Managers of World's Columbian Exposition*, 49 S.W. 458 (Ky. 1899))). This second prong of the *Comair* test "addresses *two* elements: whether the entity's function is 'governmental' as opposed to proprietary, and whether it is a matter of 'statewide' concern." *Coppage*, 459 S.W.3d at 862.

First, we must determine whether LMHA is functioning for a governmental or proprietary purpose. "A state agency 'is entitled to immunity from tort liability to the extent that it is performing a governmental, as opposed to a proprietary, function.'" *Jacobi*, 553 S.W.3d at 252 (quoting *Caneyville*, 286 S.W.3d at 804 (quoting *Yanero v. Davis*, 65 S.W.3d 510, 519 (Ky. 2001) (citing 72 Am.Jur.2d, *States, Territories and Dependencies*, § 104 (1974)))). "A proprietary function is of the type normally engaged in by businesses or corporations and will likely include an element of conducting an activity for profit." *Jacobi*, 553 S.W.3d at 255 (quoting *Caneyville*, 286 S.W.3d at 804 (citing *Schwindel v. Meade County*, 113 S.W.3d 159, 168 (Ky. 2003))).

"A government agency's immunity is limited to governmental tasks rather than allowing it an unfair advantage when partaking in profit-seeking ventures." *Jacobi*, 553 S.W.3d at 255. Although the field in question may be

9

one where private businesses may profit, it does not necessarily mean that the agency in question is performing the same task for the purpose of profit. *See id.* at 255-56. In *Jacobi*, we held that, while attorneys in the private sector work for profit, public defenders "are not at an unfair commercial advantage to private attorneys; they are representing parties that would be unable to pay attorneys in the private sector." *Id.* at 256.

In *Comair*, this Court found the regulation of the Airport Board's finances persuasive in the immunity analysis. "[T]he Board is far more limited than a private entity when setting the fees it charges for some of its services .... Since the fees can only be 'reasonable' and are subject to judicial review, much like an administrative agency's decisions." *Comair*, 295 S.W.3d at 102 (citing KRS 183.133(2)). "The Board is not a for-profit entity. Its revenues are to be used solely to make improvements and to maintain the airport itself through employees and contracts with construction and service providers." *Comair*, 295 S.W.3d at 102.

Similarly to both *Jacobi* and *Comair*, the purpose of LMHA is not to generate a profit. "The authority shall manage and operate its housing in an efficient manner so as to enable it to fix the rentals for dwelling accommodations at the lowest possible rates consistent with its providing decent, safe and sanitary dwelling accommodations, and no authority shall construct or operate any project for profit, or as a source of revenue of the city ..." KRS 80.190. The explicit purpose of LMHA is to provide housing for those in our communities who would be otherwise *unable* to afford housing through

10

the private housing industry. It is true that other companies and corporations perform property management for the purpose of profit. But that is not LMHA's goal. LMHA provides an alternative for those who are unable to engage with those private companies. LMHA is statutorily limited in setting rental fees. It must provide "the lowest possible rates" consistent with the goal of providing housing for low-income families and individuals. LMHA is not in unfair competition with the private housing market. Like in *Jacobi*, it provides an alternative for those people who are fiscally unable to engage in the private market. Its fees and finances are regulated. Rather than operating to earn a profit, the agency is solely operated to provide the housing that the General Assembly has authorized. As such, we hold that LMHA is engaging in a governmental, rather than a proprietary, function.

Determining whether a task is an "integral state function" is a complex endeavor. "[N]ot every 'public purpose' qualifies as an 'integral state function.'" *Coppage*, 459 S.W.3d at 862. In *Kentucky River Foothills Dev. Council, Inc. v. Phirman*, we noted that the goal of "alleviat[ing] poverty ... is a laudable goal, and it may even be integral to a state-at-large function." 504 S.W.3d 11, 16-17 (Ky. 2016). However, in that case, we determined that the specific task at issue—the running of a substance abuse treatment facility—was, although tangential to poverty, not for the treatment of *poverty*, but *substance abuse*. *Id.* at 17. "The fact that poverty and substance abuse may be and often are related, does not make the primary purpose of Liberty Place the alleviation of poverty." *Id.* Here, in stark contrast, the entire purpose and mission of LMHA

11

is to provide housing for low-income individuals and families. It is common knowledge that such provisions assist in the alleviation of homelessness, and in turn, poverty. The availability of housing to meet the needs of lower-income persons is a worthy and important goal. But it is up to this Court to determine whether that goal is an integral state function.

"To qualify as 'integral,' [the entity]'s actions 'must be necessary, an essential part of carrying out that state-level government function.'" *Transit Authority of River City v. Bibelhauser*, 432 S.W.3d 171, 174 (Ky. App. 2013) (quoting *Stanford v. United States*, 948 F.Supp.2d 729, 737 (E.D. Ky. 2013) (internal quotation marks omitted)). As we have recognized, there is a fine line between "public purpose" and "integral state function." However, the clarifying point here derives from the General Assembly's statements in creating housing authorities. The General Assembly has conclusively established its motive and statement of policy as to public housing:

> It is hereby declared that there exist in Kentucky unsafe and unsanitary housing conditions and a shortage of safe and sanitary dwelling accommodations for persons of low income; that these conditions necessitate excessive and disproportionate expenditures of public funds for crime prevention and punishment, public health and safety, fire and accident protection, and other public services and facilities; and that the public interest requires the remedying of these conditions. It is further declared that the assistance provided in KRS 80.280 to 80.300 for *the remedying of such conditions constitutes a public use and purpose and an essential governmental function for which public money may be spent and other aid given*; that it is a proper public purpose for any public body to aid any housing authority located or operating within its boundaries or jurisdiction, as the public body derives immediate benefits and advantages from such a housing authority or developments; and that the provisions of KRS 80.280 to 80.300 are necessary in the public interest.

12

KRS 80.270 (emphasis added). The General Assembly added: "An authority shall constitute a public body corporate and politic, *exercising public and essential governmental functions ...*" KRS 80.500 (emphasis added).

"The enunciation of public policy is the domain of the General Assembly." *Pyles v. Russell*, 36 S.W.3d 365, 368 (Ky. 2000). Often, this Court must turn to the legislative statement of public policy in making judicial determinations. *See generally Giuliani v. Guiler*, 951 S.W.2d 318 (Ky. 1997). "[A]bsent a constitutional bar or command to the contrary, the General Assembly's pronouncements of public policy are controlling on the courts, as this Court has ruled countless times." *Murphy v. Commonwealth*, 500 S.W.3d 827, 832 (Ky. 2016) (quoting *Carter v. Bullitt Host, LLC*, 471 S.W.3d 288, 296 (Ky. 2015)). Although the question of whether an entity is immune is a judicial question,[4] the question of whether a function is "integral" to the state can turn on the question of public policy. The Commonwealth, through its General Assembly, determines what priorities, responsibilities, duties, and functions the state chooses to undertake. Thus, the General Assembly, to a certain extent, must have the legislative prerogative to enunciate *what* is integral to the state's function. Granted, such a statement cannot be a broad, vague declaration without proof in the actual record; otherwise, the immunity doctrine would

---

[4] We note that "the judiciary has the sole ability to determine whether an entity is entitled to sovereign immunity[.]" *Rothstein*, 532 S.W.3d at 648 (citing *Withers v. University of Kentucky*, 939 S.W.2d 340, 342 (Ky. 1997)). But, "only the legislature can limit or waive that immunity once it has been determined." *Withers*, 939 S.W.2d at 344 (citing *Kentucky Center for the Arts v. Berns*, 801 S.W.2d 327, 329 (Ky. 1991)).

13

become a legislative whim rather than a judicial determination. However, we acknowledge, especially given the Commonwealth's strong stance on the doctrine of separation of powers,[5] that the legislative statement of public policy *informs* the judiciary's decision of whether a function is essential, or integral, to the administration of the Commonwealth.

Given this background, we further acknowledge that the General Assembly created housing authorities to administer duties that it recognized as essential and integral to the policy of the Commonwealth. LMHA was created for fulfilling this statutory responsibility. It functions within Louisville Metro to provide housing for low-income to moderate-income families and individuals. Such a function is essential, per the policy of the General Assembly.

We must also determine whether the purpose of the entity is one of state-wide concern or merely a local prerogative. "The focus ... is on state level governmental concerns that are common to all of the citizens of this state, even though those concerns may be addressed by smaller geographic entities (e.g., by counties)." *Comair*, 295 S.W.3d at 99. "In other words, without [the agency] performing its function, the state-level concern would not be fully addressed." *Bibelhauser*, 432 S.W.3d at 174 (citing *Stanford*, 948 F.Supp.2d at 739). Although LMHA functions to serve a distinct, local area, it is intended to

---

[5] It has been this Court's view "that the separation of powers is fundamental to Kentucky's tripartite system of government and must be 'strictly construed.'" *Vaughn v. Knopf*, 895 S.W.2d 566, 568 (Ky. 1995) (quoting *Legislative Research Commission v. Brown*, 664 S.W.2d 907, 912 (Ky. 1984) (quoting *Arnett v. Meredith*, 121 S.W.2d 36, 38 (Ky. 1938))).

address a statewide concern. Once again, the General Assembly has spoken: it stated that providing low to moderate-income housing is one of statewide concern. *See* KRS 80.270. Thus, while LMHA provides services for Louisville Metro customers only, but for its operation, the statewide "concern would not be fully addressed." LMHA works in tandem with housing authorities throughout the Commonwealth to protect and provide assistance on this statewide concern.

Bryant has also advanced the argument that the statutory language in creating housing authorities impliedly waived any immunity it might have otherwise had. Specifically, she cites to KRS 80.050, which states that a housing authority constituted under the chapter is "a body corporate ... with power to contract and be contracted with, to sue or be sued, and to adopt a seal and alter it at will." However, our Commonwealth's highest courts have previously held that such language does *not* waive immunity from tort. In *Wallace v. Laurel County Bd. of Educ.*, this Court's predecessor held: "the right given by the statute to sue an arm of the state . . . permitted suit against it on contracts; or to protect one's property; but such authority to sue did not embrace an action for tort committed by any of its officers or agents in the performance of a public duty." 153 S.W.2d 915, 916-17 (Ky. 1941). In *Grayson County Bd. of Educ. v. Casey*, this Court affirmed that holding: "[O]ur predecessor court held that the 'sue and be sued' language in KRS 160.160(1) authorizes suits on contracts or to protect one's property, but not for torts." 157 S.W.3d 201, 207 (Ky. 2005) (citing *Wallace*, 153 S.W.2d at 917).

15

Even were we to find this language murkier than prior manifestations of our Court have, such language would be inadequate to waive immunity. "We will find waiver only where stated 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'" *Withers v. University of Kentucky*, 939 S.W.2d 340, 346 (Ky. 1997) (quoting *Murray v. Wilson Distilling Co.*, 213 U.S. 151, 171 (1909)). "[T]he granting of waiver is a matter exclusively legislative." *Withers*, 939 S.W.2d at 344. Thus, the bare language of "sue or be sued" is inadequate, on its own, to exhibit a legislative intent to waive immunity on behalf of a governmental agency.

In conclusion, LMHA is performing an integral state function. Its services are provided for a governmental, rather than a proprietary, purpose. The General Assembly has clearly articulated the Commonwealth's policy position on providing such housing. LMHA, although localized in specific service, works to aid in the fulfillment of a statewide goal. The second prong of the *Comair* element is met. As such, we hold that LMHA is entitled to governmental immunity. The trial court correctly entered summary judgment against Bryant on this issue.

### C. Juanita Mitchell is entitled to official qualified immunity

Because we have held that LMHA is an immune entity, we must determine whether Mitchell is, therefore, extended qualified official immunity for her actions as a government employee. An immune agency's "immunity

16

extends to its employees performing discretionary tasks."[6] *Jacobi*, 553 S.W.3d at 261. "When performance of the job allows for the governmental employee to make a judgment call, or set a policy, the fact that there is uncertainty as to what acts will best fulfill the governmental purpose has resulted in immunity being extended to those acts where the governmental employee must exercise discretion." *Marson v. Thomason*, 438 S.W.3d 292, 296 (Ky. 2014). "[D]iscretionary acts or functions are those that necessarily require the exercise of reason in the adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued." *Haney v. Monsky*, 311 S.W.3d 235, 240 (Ky. 2010).

An employee's ministerial acts are not protected by immunity. *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). A ministerial act is "one that requires only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id.* (citing *Franklin County v. Malone*, 957 S.W.2d 195, 201 (Ky. 1997)). "In reality, a ministerial act or function is one that the government employee must do 'without regard to his or her own judgment or opinion concerning the propriety of the act to be performed.'" *Marson*, 438 S.W.3d at 297 (quoting 63C Am.Jur.2d *Public Officers and Employees* § 318).

---

[6] Additionally, those discretionary acts must be performed "in good faith" and "within the scope of the employee's authority." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001) (citations omitted). Bryant has never alleged that Mitchell was not acting in good faith or outside the scope of her employment.

Thus, the question before this Court is whether Mitchell's act in failing to pursue Love's eviction after Love's lease violations constitutes a ministerial or a discretionary act.[7] Bryant alleges both that (1) certain provisions of the lease created ministerial duties for Mitchell to perform and (2) that even if those duties were discretionary, once the decision to evict was made, it was Mitchell's ministerial duty to ensure that eviction came to fruition. Bryant argues that the following lease provisions create a ministerial duty for Mitchell:

Section F(7):

> The Resident is responsible to refrain from, and cause household members, guests, visitors and individuals in and around the unit by authority, permission or invitation of the Resident or the Resident household members to refrain from any conduct which:
> (a)    Is unlawful, unsafe, irresponsible, disorderly or violent or a hazard to the safety of any persons or property, including Resident, household members, visitors, neighbors or Management staff;
> (b)    Creates a nuisance or violates the City's Unnecessary Noise Ordinance (Municipal Ordinance 132.04).
> (c)    Is criminal activity that threatens the health and safety, or right to peaceful enjoyment of the premises of [LMHA] by Residents or employees of [LMHA].

Further, the lease provided at the end of Section F:

> A single noncurable violation of any of the terms and conditions of Section F, RESPONSIBILITIES OF THE RESIDENT including but not limited to any drug-related or criminal activity by Resident, or Resident's family members, guests, visitors, or individuals on LMHA property at the invitation of Resident or under the control of Resident shall be deemed a serious violation of material terms of this lease and good cause for termination of this residential lease without further opportunity to cure or remedy the violation.

---

[7] Bryant also argued that Mitchell could not be immune because LMHA was not immune. However, because we have held that LMHA is an immune entity, this argument is now moot.

18

Section L(3) also stated:

> Any criminal activity that threatens the health and safety or right to peaceful enjoyment of the Premises of [LMHA] by Residents or employees of [LMHA] or drug-related criminal activity on or off the premises, engaged in by a public housing tenant[,] any member of the tenant's household, or any guest or other person under the tenant's control, shall be cause for termination of the tenancy.

Mitchell does not dispute that Love violated the terms of her lease and specifically cited to Section F(7) in the warnings and notices sent to Love. Thus, if the finding of that violation creates an *absolute duty* to evict, then the act is ministerial, and Mitchell is not entitled to immunity. However, if Mitchell still retained discretion in making the decision to evict, there is no ministerial duty. The premise of Bryant's argument is that the "shall" language is a *mandatory*, and thus ministerial, duty once the provision of the lease has been violated. But Bryant misinterprets the language of the lease.

Perhaps if the lease stated that any of these violations "shall result in termination," we may adopt Bryant's interpretation. However, all the lease states is that the violations in question "shall be deemed a serious violation of material terms of this lease and good cause for termination" or "shall be cause for termination of the tenancy." This does not result in automatic eviction; it only puts residents on notice that, should they violate these particular provisions, LMHA has the contractual authority to immediately evict. It does not create a mandatory duty for LMHA or Mitchell to evict; it provides them the opportunity to do so.

Bryant correctly states that the term "shall" is usually interpreted as a mandatory directive. *See Seeger v. Lanham*, 542 S.W.3d 286, 290 (Ky. 2018).

19

But "the rest of the sentence ... must be acknowledged." *Id.* The word "shall" is an auxiliary verb; it must be followed by another action. The reader must ask: the subject shall what? Here, the violation shall: (1) "be deemed a serious violation of material terms[;]" (2) be "good cause for termination of this residential lease without further opportunity to cure or remedy the violation[;]" and (3) "be cause for termination of the tenancy." These directives can be summed up as stating that these violations shall be deemed sufficient for LMHA to *make the decision* to immediately evict. It does not place a requirement upon the landlord to do so, however. The lease provisions allow for the landlord and LMHA to make the final appropriate decision given the specific facts. Due to this rather broad grant of discretion, we must hold that the lease provisions do *not* create a ministerial duty and Mitchell was performing discretionary tasks in making the decision of whether to evict Love.

Bryant also states that, once the decision to evict was made, Mitchell's task *became* ministerial. A discretionary act can become a ministerial one. *See Gaither v. Justice & Public Safety Cabinet*, 447 S.W.3d 628, 632-37 (Ky. 2014). However, the record also belies this assertion. In Mitchell's deposition, plaintiff's counsel specifically asked: "So even though [the termination letter] says no right to cure, they do have an opportunity to come and demonstrate a willingness and an ability to comply with the lease?" Mitchell unequivocally responded, "Yes ... That's true." In fact, Mitchell stated that, from the procedure taken in response to Love's 2008 violation, it seems Love cured the violation even though she was sent a termination letter. Plaintiff's counsel also

20

asked whether there was an opportunity to cure a violation leading to a 14-day termination letter. Mitchell stated, "They always have a right to cure. That's not up to me. When it crosses the desk, then that person, my supervisor, will make that decision." Counsel asked: "[D]oes the manager have the right to say ... I know they got the 14-day letter, they haven't done anything to cure it, but you know what; I like them; I'm not going to prepare the writ [of eviction] and send it on?" Mitchell responded that "The supervisor *always* has that privilege." (emphasis added).

Per Mitchell, the first step in proceeding in the legal process for eviction is for the manager to fill out a "Form A." That form is sent to the supervisor, then the director and executive director, and then eventually, the lawyers become involved to initiate eviction proceedings. However, the decision to fill out a "Form A" arises entirely from the property manager's discretion and decision-making. Counsel asked: "[Y]ou wouldn't fill out a Form A[] unless you thought you had sufficient proof that the person was guilty of what they were guilty of, right?" Mitchell responded, "Correct." Once again, the decision to initiate the lengthy process for eviction begins with the property manager's ascertainment of the facts, investigation, and ultimate discretion in deciding what action is appropriate. Even once the decision was made, Mitchell responded affirmatively when asked whether she "had authority ... to stop the eviction process if somebody cured their problems."

Discretionary acts are "those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment ..." *Sloas*, 201

21

S.W.3d at 477 (quoting *Yanero*, 65 S.W.3d at 522). "Discretion in the manner of the performance of an act arises when the act may be performed in one of two or more ways, either of which would be lawful, and where it is left to the will or judgment of the performer to determine in which way it shall be performed." *Sloas*, 201 S.W.3d at 477 (quoting *Collins v. Commonwealth of Ky. Natural Resources and Environmental Protection Cabinet*, 10 S.W.3d 122, 125 (Ky. 1999) (quoting *Malone*, 957 S.W.2d at 201)). Mitchell was always empowered with authority to *decide* what action was appropriate, change that decision, change the course of action, stop the proceedings, etc. Her actions were discretionary in nature. She is cloaked in qualified official immunity for these decisions.

## IV. CONCLUSION

The judgments of both the Jefferson County Circuit Court and Court of Appeals are affirmed. LMHA is a state agency entitled to the protection of governmental immunity. Mitchell, as LMHA's employee performing discretionary acts, is shielded by qualified official immunity. The circuit court correctly entered summary judgment against Bryant.

Minton, C.J.; Hughes, Keller, Lambert, VanMeter and Wright, JJ., sitting. All concur.

22

COUNSEL FOR APPELLANT:

David J. Guarnieri
Jason Hollon
McBrayer, McGinnis, Leslie & Kirkland, PLLC

Robert Martin Guarnieri


COUNSEL FOR APPELLEES:

Patricia Colleen Le Meur
John F. Parker, Jr.
Nicholas Hart
Phillips Parker Orberson & Arnett, PLC

Richard H. Nash, III
Law Office of Richard H. Nash, III