RENDERED: DECEMBER 17, 2020
TO BE PUBLISHED

# Supreme Court of Kentucky

2018-SC-0601-DG

KIMBERLY HOWARD, AS EXECUTRIX OF                                        APPELLANT
THE ESTATE OF EMMA JEAN HALL,
DECEASED


                           ON REVIEW FROM COURT OF APPEALS
V.                              CASE NO. 2017-CA-0747
                       MAGOFFIN CIRCUIT COURT NO. 15-CI-00103


BIG SANDY AREA DEVELOPMENT DISTRICT, INC.                              APPELLEE


## OPINION OF THE COURT BY CHIEF JUSTICE MINTON

## AFFIRMING

Kimberly Howard, in her capacity as executrix of the Estate of Emma Jean Hall, deceased, brought this negligence and wrongful-death action in the circuit court asserting claims against Big Sandy Area Development District, Inc. ("BSADD"). The circuit court granted summary judgment, holding that BSADD was shielded from liability by governmental immunity and that, in any event, Howard's evidence did not support the claims as a matter of law. The Court of Appeals unanimously affirmed on appeal. On discretionary review, we hold that BSADD does not have governmental immunity because, though a creature of statute, it does not perform an integral state function. So we disagree with the Court of Appeals' decision on that important point of law, but we affirm the result reached by the Court of Appeals panel and the trial court

because we agree that the trial court properly granted summary judgment on the merits of Howard's claims against BSADD.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Ninety-three-year-old Emma Jean Hall died of the effects of sepsis that developed from a bed sore on her lower back. Despite the challenges of advancing age and declining health during the last decade of her life, Hall was able to remain in her home with the help of friends, family, and BSADD homecare aides, who performed basic housekeeping, and periodic bathing. Hall's various helpers alternated, making intermittent but frequent visits to her home.

BSADD is an area development district ("ADD") that encompasses the Kentucky counties of Floyd, Johnson, Magoffin, Martin, and Pike.[1] BSADD, like some other ADDs in this state, arranges for assistants, called homecare aides, to visit elderly clients on a regular basis as part of the state's "Homecare Program."[2] This homecare program is specifically designed to allow otherwise independent elders to remain in their homes and out of nursing homes. This program is just one of several social and economic projects that BSADD helps coordinate and facilitate in the Eastern Kentucky region.

BSADD assigned a homecare aide to help Hall with very basic housekeeping and self-care—sometimes to change her clothes and sometimes to help her bathe. As a matter of BSADD policy, these aides were otherwise limited in what they could do for Hall. For instance, BSADD's homecare

_____

[1] Kentucky Revised Statute (KRS) 147A.050(11).
[2] 910 Kentucky Administrative Regulation (KAR) 1:180(3).

2

services expressly excluded rudimentary medical services, such as handing prescribed medication to Hall. BSADD merely supplemented Hall's existing network of family and neighborhood help.

The BSADD homecare aides were regularly scheduled to visit Hall at her home twice a week for a period of two hours. During one of these routine visits, the homecare aide found Hall slumped in her recliner, appearing ill. Hall told the aide to call her son. Hall was transported by ambulance to Pikeville Medical Center.

The treating physician at Pikeville Medical diagnosed a severe bedsore on Hall's lower back. Sadly, Hall's condition progressed to sepsis, and she died as result of the infection. The doctors gave differing accounts of how the condition progressed and, therefore, how noticeable the bedsore would have been to Hall's caretakers.[3]

Howard, brought this negligence action against BSADD, alleging that Hall's condition could have been found and remedied had BSADD's homecare aide not been negligently inattentive. BSADD moved for summary judgment claiming governmental immunity shielded it from suit and that evidence of its negligence was insufficient as a matter of law.

The trial court granted BSADD's motion for summary judgment, holding

[3] Hall's treating physician, the physician who diagnosed the bedsore at Pikeville Medical, testified that a bedsore at the stage it was discovered could have taken anywhere from 10 to 15 days to develop. This expert opined that only negligence can explain how the condition progressed to the stage it did without intervention from BSADD aides, that the BSADD aide would have and should have noticed the condition and helped Hall before it was too late.

BSADD's doctor testified, after reviewing the case, that even though a bed sore this severe took roughly 10 to 15 days to develop, the sore and its progression were largely subcutaneous (under the skin) for most of that time, Hall's condition probably could not have been apparent by visual inspection until it was far too late.

that BSADD enjoyed governmental immunity and that the facts supported no special duty on BSADD's part, much less a breach of such duty. The Court of Appeals unanimously affirmed the decision of the circuit court. We granted Howard's motion for discretionary review.

## II. ANALYSIS

We review a trial court's grant of summary judgment de novo, and in doing so, we owe no deference to the legal conclusions of the courts below.[4]

The primary issue is whether BSADD enjoys governmental immunity from negligence claims as a "quasi-governmental" entity. As a rule, state government and its agencies are protected by sovereign immunity from civil suit.[5] In some cases, this immunity can extend to non-governmental or quasi-governmental bodies under a different name: governmental immunity.[6]

The controlling authority on whether a quasi-governmental entity enjoys governmental immunity is *Comair, Inc. v. Lexington-Fayette Urban County Airport Corp.*[7] Under *Comair*, governmental immunity extends to a quasi-governmental entity if (1) it has immune "parentage" and (2) it performs an "integral" function of state government.

An entity has immune "parentage" if it owes its origin to an entity that is itself entitled to sovereign or governmental immunity and if it operates as "an

---

[4] *Shelton v. Kentucky Easter Seals Soc., Inc.*, 413 S.W.3d 901, 905 (Ky. 2013).

[5] *Yanero v. Davis*, 65 S.W.3d 510, 523 (Ky. 2001). *See Bryant v. Louisville Metro Housing Authority*, 568 S.W.3d 839, 845–46 (Ky. 2019).

[6] *Bryant*, at 846 ("[G]overnmental immunity is an extension of the parent's sovereign immunity.").

[7] 295 S.W.3d 91 (2009).

agency (or *alter ego*) of [said] clearly immune entity."[8]  A government function is "integral" if, taken as a whole and on balance,[9] it involves a statewide policy concern and its function is necessary or essential to address that concern.[10] The state government engages in many programs and projects, but "state-level government concerns" for our purposes include fundamental functions like "police, public education, corrections, tax collection, and public highways."[11]

The *Comair* analysis is thus a fact-sensitive, case-by-case analysis.[12]  We must acknowledge that under Kentucky law, "while the state enjoys immunity from suit, a level of constraint must be exercised in its application to other entities in order to respect both constitutional and important public policy limitations."[13]  And "certainly not every business can be immunized simply because it is established by act of the General Assembly."[14]  With these principles in mind, we can now wade into the muddy waters of governmental immunity.

## A. BSADD has immune parentage.

This first element concerns the nature of the entity in question, or what it is, with specific regard to its legal origin and its governance.[15]  ADDs are

---

[8] *Id.* at 99 (emphasis added).

[9] *Id.* at 98.  *See, e.g., Stanford v. U.S.*, 948 F. Supp. 2d 729, 736 (2013); *N. Kentucky Area Planning Comm'n v. Cloyd*, 332 S.W.3d 91, 95–96 (Ky. App. 2010) (assessing the balance of an area planning commission's activities).

[10] *Comair*, at 99.

[11] *Id.*

[12] *Id.*

[13] *Bryant v. Louisville Metro Housing Auth*, 568 S.W.3d 839, 846 (Ky. 2019). (citing *Coppage Constr. Co. v. Sanitation Dist. No. 1*, 459 S.W.3d 855, 859 (Ky. 2015)).

[14] *Kentucky Ctr. for the Arts Corp. v. Berns*, 801 S.W.2d 327, 331 (Ky. 1990).

[15] *See Comair*, at 99.

creatures of statute, established and authorized to operate in their respective regions under KRS 147A.050. Statutes and regulations refer to the ADDs as "public agencies" or "special districts" of state and local government.[16] ADDs are therefore created by statute; owe their origin directly to the legislature, which is an immune entity; and are at least *nominally* "public agencies" by statute. This makes them potentially entitled to immunity.

As a matter of practice BSADD is apparently quite independent from state government, both legally and functionally, which undercuts any argument that BSADD is an "alter ego" of the state legislature. BSADD is not part of the legislative or executive branches of state government like the Department for Health and Family Services (hereinafter "the Cabinet"), the Department for Aging and Independent Living, or the Department of Local Government. Instead, BSADD is a distinct corporate entity. It does not apparently create, direct, or influence policy at any significant level, such as by regulation. Interestingly, KRS 147A.060 states that "[a] person who is a state officer, a deputy state officer, or a member of the General Assembly may serve only in a nonmember advisory capacity to the board of directors of an area development district." These facts make it hard to say how it acts as an alter ego or even as a legal extension of its immune parent, the legislature, in the same way other public agencies do.

Further, BSADD operates relatively independently and is subject to minimal direction and oversight from state agencies.[17] It is instead subject to

---

[16] *See* KRS 65.005, KRS 147A.040(15), and 147A.080(10).
[17] *See Bryant*, at 846–47 (discussing entity's independence from the legislature in determining whether it is a "state agency" for purposes of *Comair*) ("There is

the control of a board of directors that can independently sue and be sued.[18] In sum, BSADD is not even functionally part of the state government, even by statute. Rather, it sometimes serves as a corporate instrumentality of different state agencies. It is not an "agency" or part of an agency in any meaningful sense of that term.

**B. BSADD does not perform an integral function of government.**

This second element of *Comair* concerns the nature and scope of what an entity actually does, focusing on the entity's relationship to state government.[19] This is the weightier of the two factors under consideration.[20] This bigger, more complex issue, discussed at length by the Court of Appeals, requires us to determine whether BSADD performs an "integral" function of state government, i.e., (a) as a whole and on balance, it is (b) necessary and essential to the execution of (c) a state-level policy. For the following reasons, we find that BSADD plays a proprietary role, is not necessary to the execution of state-level policy or services, and thus does not perform an integral state function.

---

sufficient control authorized [by statute] to find a connection adequate for this prong of the *Comair* test . . . . These statutes portray a definitive, albeit more removed than other agencies of the government, control from the legislative and executive branches over LMHA.").

[18] KRS 147A.080(2).

[19] *Comair*, at 99 ("[S]overeign immunity should extend . . . to the *departments, boards or agencies* that are such *integral parts* of state government as to come within the regular patterns of administrative organization and structure.") (quoting *Kentucky Center for the Arts Corp. v. Berns*, 801 S.W.2d at 332) (emphasis added).

[20] *See id.* ("The more important aspect of *Berns* is the focus on whether the entity exercises a governmental function, which that decision explains means a 'function integral to state government . . . . [Past decisions] clearly demonstrate a shift in focus to the nature of the entity.'") (citing *Berns*, at 332, other citations omitted).

7

### 1. BSADD's role is proprietary—advising, planning, contracting, and coordinating various regional projects.

Under *Comair*, an entity's "function" must be identified and understood as the sum of its discrete functions.[21]  The Court of Appeals seems to have correctly described BSADD's homecare program and how it functions, its limited role within a broader state and federal scheme of services, and how beneficial it is to homecare clients.  But the Court of Appeals did not adequately consider the homecare program as only a discrete part of what BSADD does, seemingly missing what BSADD is in a fuller sense.  This crucial misstep distorts what should have been a more holistic analysis under *Comair*.[22]

The legislature established BSADD to support social and economic development, a notably broad purpose.  On the ground, BSADD supports the coordination of various social services and state projects, but it does not, for the most part, seem to provide government services directly.  Its services may indeed help the government accomplish various projects more expeditiously, but it does not generally complete the projects itself.  And though it happens to implement its limited homecare program, that is about as "hands on" as BSADD gets in support or furtherance of government programs.

The Court of Appeals further erred when it incorrectly conflated the homecare program with more direct and comprehensive public services meant to aid under-resourced persons.  This was evident, for instance, in the Court of

---

[21] *See Berns*, at 332.

[22] *Comair*, at 98 (citing *Berns*, at 332).

8

Appeals' comparison between BSADD's homecare service and a state-run mental hospital operated by the Cabinet in *Hamblen ex rel. Byars v. Kentucky Cabinet for Health and Family Services*.[23] In that case, Hamblen, by and through his guardian Byars, sued the Cabinet for Health and Family Services, the Kentucky Department for Mental Health and Mental Retardation Services, and the state hospital and its employees for negligence. Hamblen was sixty-one years old, severely disabled mentally and physically, and a resident at the state hospital for over thirty years.[24] The Court of Appeals held in *Byars* that the defendants, as legal extensions of the state via the Cabinet, were clearly performing government functions and were therefore protected from suit by governmental immunity.[25]

The Court of Appeals erred when, in the present case, it compared BSADD to a Cabinet-run state hospital "provid[ing] for the health and welfare of [the state's] dependent classes."[26] Provision of long-term, comprehensive mental-health services by the Cabinet at a brick-and-mortar state hospital, sometimes to persons as severely disabled as Hamblen in *Byars*, is different from BSADD's services helping independent-living elders with basic, non-medical household tasks in their own homes. And the plaintiffs in *Byars* sued the Cabinet itself, an agency that is indisputably a part of state government.

---

[23] 322 S.W.3d. 511 (Ky. App. 2010).

[24] *Id.* at 514.

[25] *Id.* at 516.

[26] *Howard v. Big Sandy Area Dev. Dist., Inc.*, No. 2017-CA-000747-MR, 2018 WL 3672708, at *5 (Ky. App. Aug. 3, 2018).

Even the Court of Appeals' quote from the *Byars* case demonstrates a serious distinction between the *Byars* defendants and BSADD, as the mental-health services were "carried out under *the direct auspices* of state government and were *functions integral* to state government."[27] BSADD does not truly operate "under the auspices" of the Cabinet or any other government agency, even with respect to the homecare program. The record shows that BSADD's interactions with the Cabinet and the Department of Aging and Independent Living are rather limited and infrequent. The relationship is more contractual and proprietary than supervisory.

Even if this homecare service in isolation could be characterized as a type of integral government service, which it cannot, it still only amounts to part of what BSADD does. On balance, BSADD does not serve the sort of integral welfare functions the Court of Appeals described. Rather, BSADD is mostly a facilitator, a point of contact, and an organizer. BSADD itself simply does not disburse welfare, provide other services directly to the public, or provide shelter or healthcare to those in need as characterized by the Court of Appeals.

### 2. BSADD is not "necessary" or "essential" to the execution of public services and projects.

Next, *Comair* requires that an entity be "necessary" or "essential" to the execution of a government function to the point that it is practically part and parcel of the legal and operational structure supporting the program.[28] The

---

[27] *Id.* (citing *Byars*, at 516–17) (emphasis added).

[28] There is conceptual overlap here with the "alter ego" point under the first *Comair* factor, but this factor focuses more on the degree of integration of an entity's corporate structure into state government.

Court of Appeals did not directly reach this point, though it did briefly discuss BSADD's statutory relationship with the Cabinet for Health and Family Services.[29] BSADD's various projects can be accomplished, legally and functionally, by government agencies themselves or by other entities, according to the statute cited.[30] BSADD's cooperation with the Cabinet with respect to the homecare program does not define BSADD, and the Cabinet's cooperation with BSADD does not define its general provision of public services and resources to needy Kentuckians. BSADD's role can be, and is in fact, accomplished by other private or public entities that can assume the same coordinating, planning, and organizing role BSADD plays. Without BSADD, the government's ability to implement state or local policy would not cease to be, it would simply be accomplished by other means.

Unlike the Cabinet or its constituent departments, for instance, BSADD has not obviously "come within regular patterns of administrative organization and structure" of state government.[31] Granted, BSADD happens to have an internal corporate structure through which it coordinates its homecare services in the Big Sandy region. But BSADD's role is complementary to state government, not necessary to it. In other words, while BSADD does good work for the elderly by providing homecare, one can imagine that service being

---

[29] *See* KRS 205.460(1) ("The (Health and Family Services) cabinet shall fund, *directly or through a contracting entity or entities*, in each district, a program of essential services which shall have as its primary purpose the prevention of unnecessary institutionalization of functionally impaired elderly persons.") (emphasis added)).

[30] *See* KRS 205.460(1) (". . . directly or through a contracting entity or entities. . .").

[31] *See Comair*, at 99.

11

provided without BSADD, but one cannot imagine provision of that service, even if just by contract, without the Cabinet itself or the Department for Aging and Independent Living. The latter are clearly the more necessary and essential parts of the government's provision of those services, while BSADD has merely contracted with the government according to statute to provide that service among others. We conclude BSADD is not "necessary" or "essential" to government functions under *Comair*.

### 3. *BSADD's role is region-specific by design and in substance, not statewide.*

Finally, *Comair* requires that an entity's function predominantly be of statewide importance.[32] BSADD's operation is not of statewide concern. BSADD was intended by statute to address region-specific concerns, and that is all it does. Even its name, the "Big Sandy" Area Development District, indicates such a local focus. BSADD is clearly authorized to run on an exclusively regional level with exclusively regional interests in mind. Overall, BSADD's existence and operation has primarily regional implications and is not of "statewide" policy concern under *Comair*, notwithstanding the General Assembly's establishing ADDs in various regions across the state.

### C. Summary judgment was proper on the merits of Howard's negligence claim.

Having dispensed with the argument that BSADD enjoys governmental immunity, we turn briefly to the merits of the motion for summary judgment on the negligence claims. The trial court ruled—and the Court of Appeals affirmed—that BSADD's agents owed no identifiable duty of care to Hall and

---

[32] *Id.* at 98.

that there was no evidence of breach under a general standard of care. We affirm this part of the decision, holding that BSADD and its homecare aides did not owe a special duty of care to Hall, even by its rendering services to her through the Homecare Program.

Summary judgment is to be "cautiously applied and should not be used as a substitute for trial."[33] A party is nonetheless entitled to judgment as a matter of law when, after viewing the facts in a light most favorable to the nonmoving party, there is no issue as to any material fact as a matter of law."[34] The trial court correctly stated that under Kentucky law, negligence consists of a duty, a breach of that duty, and a consequent injury.[35] Duty is a matter of law,[36] and where there is no duty, there can be no breach.

The undisputed facts indicate BSADD did not render medical services or agree to render medical services to its homecare clients. It did not and does not run a medical facility or operate a nursing home. Its homecare aides played a role practically identical to Hall's family members and neighbors, and it only provided its limited services two days a week. It certainly did not owe the higher duty of care owed by medical professionals. BSADD cannot be considered Hall's agent, and Hall was not dependent on BSADD's assistance. The record simply contains no evidence that BSADD breached a standard of care to Hall, even if Howard could prove a homecare aide could have or should

---

[33] *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 483 (Ky. 1991).

[34] CR 56.03; *Id.* at 480.

[35] *See M&T Chemicals v. Westrick*, 525 S.W.2d 740, 741 (Ky. 1974).

[36] *Pathway v. Hammonds*, 113 S.W.3d 85, 89 (Ky. 2003).

13

have noticed Hall's subcutaneous bedsore early in its progression. Entry of summary judgment was proper, as no issue of material fact was left for a jury to resolve. BSADD was entitled to judgment as a matter of law on the substance of the negligence claim, not because of governmental immunity.

## IV. CONCLUSION

The lower courts incorrectly held that the Big Sandy Area Development District is protected by governmental immunity with respect to this negligence claim. But the Circuit Court properly entered, and the Court of Appeals properly affirmed, summary judgment on the negligence claim itself. Accordingly, we affirm the entry of summary judgment but on different grounds than the Court of Appeals.

All sitting. All concur.


COUNSEL FOR APPELLANTS:

Richard Eric Circeo
Circeo Fannin, P.S.C.

Robert Earl. Salyer
Wilkes & McHugh, P.A.

COUNSEL FOR APPELLEES:

Jonathan C. Shaw
Porter, Banks, Baldwin & Shaw, PLLC